# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1131

_____

David Torgerson; Jami Mundell,      *

                               *

          Appellants,        *

                               *   Appeal from the United States

     v.                      *   District Court for the

                               *   District of Minnesota.

City of Rochester,            *

                               *

          Appellee.         *

_____

Submitted: November 17, 2009
Filed: May 21, 2010

_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

David Torgerson and Jami Mundell (collectively, "appellants") challenged the City of Rochester, Minnesota's decision not to hire them as firefighters. Torgerson and Mundell alleged that Rochester discriminated against them in violation of state and federal law. Torgerson, a Native American male, alleged discrimination on the basis of national origin. Mundell, a white female, alleged gender discrimination. Torgerson and Mundell made the claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §§ 2000e–2000e-17 (20\00), and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01–.41 (2006). In addition, Torgerson brings a claim under 42 U.S.C. § 1981 (2000). The district court granted Rochester's motion for

summary judgment. For the reasons set forth below, we affirm in part and reverse in part.

## I. *Background*
### A. *The Hiring Process*

Rochester followed a state statute-driven process for hiring firefighters. In accordance with Minnesota Statute § 420.06, Rochester's Fire Civil Service Commission ("the Commission") oversees the employment of all officers of the Rochester Fire Department ("Fire Department"). The Commission consists of three Commissioners, and any Commission action requires an affirmative vote by at least two Commissioners.

According to the Commission's Fire Civil Service Rules and Regulations ("the Regulations"), if a candidate possesses the minimum requirements to apply,[1] candidates must then pass written and physical fitness tests to be eligible for appointment. Phase I of the examination process is a written test, which counts for 30 percent of a candidate's final score. The candidates who receive the 50 highest scores on the written test advance to Phase II, the physical agility test. The physical agility test also accounts for 30 percent of a candidate's final score.[2] Of the 50 candidates who participate in Phase II, all who pass the physical agility test advance to Phase III, which is an interview with a three-person panel.

---

[1]It is undisputed that Torgerson and Mundell possessed the minimum requirements.

[2]Applicants are awarded points for Phase II based on the time it takes them to complete the agility test. An applicant who takes more than 6 minutes and 30 seconds to complete the agility test fails the test and cannot continue in the examination process. Neither Torgerson nor Mundell challenge the written or physical examinations.

All three panel interviewers score a candidate's responses to the interview questions on a scale of 1 to 10. One panel interviewer represents the Commission, one represents Rochester's human resources department, and one represents the Fire Department. The human resources department provides a set of interview questions and instructs the panel on how to ask the questions and what responses are considered good responses. These questions are also distributed to the candidates prior to the interview. The panel interviewers are given objective scoring criteria to establish which indicators show whether a candidate has desired qualities. Nonetheless, Rochester concedes that the panel interview contains inherent subjectivity. This panel interview accounts for the final 40 percent of a candidate's final score.[3] Based on the scoring from the three phases of the selection process, each candidate is ranked and placed in rank order on an eligibility list that the Commission then certifies. The Commission then votes to certify the eligibility list, which stands for two years. All candidates on the eligibility list are qualified for the position of firefighter, although those ranked higher are considered more qualified.

According to the Regulations, when a vacancy is anticipated or occurs, the fire chief must make a written request to the Commission to certify to the Rochester City Council ("City Council") the names of the persons eligible for appointment. Minnesota Statute § 420.07(7) requires the Commission to certify "the three names standing highest on the appropriate list to fill any vacancy" ("rule of three"). Section 420.07 and the Regulations permit—but do not require—the certification of up to two eligible candidates from each "protected group" for which a disparity exists between the composition of the Fire Department and Rochester's approved affirmative action

---

[3]To get the final score, the candidates' "raw" scores for each phase are converted to "eligibility points" by multiplying the raw score for each phase by the weight assigned to the phase. A candidate's final score is the total of his or her eligibility points, including any veteran's points awarded in accordance with Minnesota Statute § 197.455. Non-disabled veterans receive a credit of five eligibility points and disabled veterans receive a credit of ten eligibility points. *Id.*

goals.[4] This expanded certification is in addition to the rule-of-three certification and is made in rank order.

The rule of three requires the Commission to certify nine candidates for seven open positions. For example, the Commission must certify the first, second, and third-ranked candidates for the first position. Then, assuming Rochester appoints the highest-ranked candidate for the first position, the Commission must certify the second, third, and fourth-ranked for the second position, the third, fourth, and fifth-ranked candidates for the third position, and so on, until certifying the seventh, eighth, and ninth-ranked candidates for the seventh position. The Commission may also certify protected group candidates in addition to the rule-of-three candidates pursuant to the expanded certification procedure. However, before certification, each candidate eligible for certification for appointment, including any protected-group candidate, must pass one final stage.

The final candidates must pass a background check and an interview with the fire chief, as well as medical and psychological examinations. According to the Regulations, if a candidate fails the interview with the fire chief, background check, medical examination, or psychological examination, the Commission considers the next qualified candidate on the eligibility list. The City Council makes the final hiring decision, but according to City Council member Patrick Carr, the City Council abides by the recommendations the Commission offers. In the past, Rochester has used an expanded certification to hire women and non-white firefighters who were not ranked at the top of the eligibility list. However, if a protected class applicant moves on to the fire chief interview, the candidate retains his or her original rank on the eligibility list. Therefore, although all candidates on the eligibility roster meet the minimum qualifications for the firefighter position, those at the top of the list are recognized as more qualified for the position than those at the bottom of the list.

---

[4]Native Americans and women are considered protected groups.

The focus of the final fire chief interview changes when it comes to interviewing candidates lower on the list pursuant to expanded certification. Ordinarily, the final interviews are used to determine if the testing in Phases I, II, and III missed something that shows there is a reason *not* to hire a candidate. With respect to protected-class candidates who rank on the bottom of the list, however, the interviews are used to see if the testing missed something that shows there *is* a reason to hire the candidate over those scoring higher in the process.

B. *The Challenged Hirings*

In fall 2005, Rochester sought to hire seven firefighters. Rochester received funding for three positions through a federal "Staffing for Adequate Fire and Emergency Response" (SAFER) grant. The SAFER grant provided federal funds to aid Rochester in hiring additional firefighters. The grant itself outlines its purpose:

> The purpose of the SAFER grant is to award a grant directly to volunteer, combination, and career fire departments to help the departments increase their cadre of firefighters. Ultimately, the goal is for SAFER grantees to enhance their ability to attain 24-hour staffing and thus assuring their communities have adequate protection from fire and fire-related hazards.

Program Guidance for the Staffing for Adequate Fire and Emergency Response (SAFER) Grants 3 (May 2005), available at www.fishers.in.us/egov/docs/1118931743_470855.pdf.

The grant contained a list of "Grantee Responsibilities" which included the following: "Grantees, to the extent possible, will seek, recruit, and appoint members of racial and ethnic minority groups and women to increase their ranks within the applicant's department." *Id*. at 18.

In 2005 Rochester began a hiring process that resulted in the certification of 48 candidates on the eligibility list. The eligibility list included three protected-group candidates: Torgerson, Mundell, and a second white female not a party to this appeal. Torgerson is a member of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin. At the time of his application to the Fire Department, he was a volunteer firefighter. Torgerson had completed three years of college toward a degree in fire protection, including completion of Fire Fighter I and Fire Inspection courses, for which he held licenses. He had received certifications as an Emergency Medical Technician (EMT) from the National Registry of Emergency Medical Technicians (NREMT) and the Minnesota Emergency Medical Services Regulatory Board. Mundell, at the time of her application, had an associate degree in business management and had earned a diploma in intensive care paramedics from a local community college. She had a NREMT certificate, and her EMT-Basic license. She also received licenses for completing Fire Fighter I and Fire Fighter II courses.

At the end of the objective written and agility phases of the examination process (Phases I and II), Torgerson was ranked 41st and Mundell was ranked 46th out of 48 candidates. By virtue of passing the agility test, both candidates advanced to the panel interview phase. Mundell's score sheet indicates that Battalion Chief Charles Hermann, Rochester Human Resources Risk Management Analyst Joan Till-Born, and Commissioner Joe Powers conducted Mundell's panel interview. According to Torgerson's score sheet, Till-Born, Hermann, and Commissioner John Withers conducted Torgerson's panel interview. Both Torgerson and Mundell agree that the questions asked were what they anticipated based on the list of possible questions and that none of the questions were inappropriate. Mundell and Torgerson scored 37th and 41st, respectively, on the panel interview phase, which is a subjective phase. This scoring, combined with their scores from the written and physical examinations phases, placed Mundell 40th on the eligibility list and Torgerson 45th when the

Commission certified the eligibility list of 48 candidates at a meeting on November 22, 2005.[5]

Notably, some candidates—including those who benefitted from the proper application of veteran's points—made dramatic increases in the rankings after the subjective panel-interview phase. In fact, of the top eight-ranked candidates on the original eligibility list, seven were awarded veteran's points, including the top six. This illustrates the narrow margin between all candidates in terms of total score. As will be explained *infra*, this portion of the application process had substantial impact on the overall rank of the candidates. On December 15, 2005, Fire Chief David Kapler sent a memorandum to the Commission asking it to forward a list of candidates from the eligibility list to fill seven vacancies.

On January 18, 2006, the Commission met and discussed the purpose of the SAFER grant and whether the Commission should expand the certification to include protected group candidates. At the meeting, Rochester Human Resources Director Linda Gilsrud noted the "minimal differences in the total points between candidates" on the eligibility list.[6] Gilsrud explained the responsibilities attached to the SAFER grant and informed the Commission that there were three protected-class applicants who had been certified on the eligibility list. Powers said that while all candidates on the eligibility list are qualified, the rank order should be carefully considered. The Commission then passed a motion to certify to the City Council the rule-of-three candidates in rank order for six of the appointments and the rule-of-three candidates plus an expanded certification for the seventh appointment. As a result, nine initial candidates, plus the protected-group candidates, received interviews. The 12 eligible candidates were then required to complete the final phases of the selection process:

---

[5]The other female candidate was ranked 37th. It is unknown why 48 and not 50 candidates remained on the eligibility list at this point.

[6]A total of ten points separated the candidates ranked 1st and 25th.

an in-depth background investigation and interview with the fire chief. Torgerson and Mundell moved on to the fire chief interview for the seventh position, while retaining their 45th and 40th rankings, respectively. By recommending all three protected-class applicants for only the seventh position, at most one member of the protected class could have been hired.

Kapler, with the assistance of Deputy Fire Chief Dan Slavin, interviewed Candidates 1 through 9—all white males—and the three protected-group candidates.[7] When interviewing the top-ranked candidates, Kapler looked to see if there was a "red flag. Something that show[ed] up. It could be a gut-level feeling . . . that might give us a clue that there is a concern about a candidate." When interviewing the protected-group candidates, Kapler looked to see if there was "something that might have been missed. Is there some quality or attribute this person brings that didn't come out in the test that we can say, 'Wow, this is a strong candidate regardless of their test scores.'" Kapler failed Candidate 3 because he did not have his NREMT certification. Kapler also failed Candidate 4 because he did not appear for his interview.

Kapler then interviewed four additional candidates—Candidates 10 through 13. On February 13, 2006, Kapler issued a memorandum containing his recommendations. In addition to not recommending Candidates 3 and 4, he also did not recommend Candidate 10 because he "was not eligible for [NREMT registry] before the [eligibility] list was certified" and Candidate 11 because he did "not demonstrate the level of maturity and preparedness to be successful."

Kapler also did not recommend the three protected-group candidates because they did not "demonstrate[ ] themselves to be equally or better qualified" than the recommended individuals. According to Kapler's notes from the interview, he found

---

[7]The candidates are referred to by their ranking on the eligibility list.

that Torgerson had "awkward communication"; came across as "unsophisticated"; had difficulty communicating; in sum, "he lacked the characteristics other applicants possessed." Kapler also found that Torgerson did not demonstrate anything to make himself more qualified than the other candidates. Kapler did not recommend Mundell because during the interview she did not demonstrate that she was more or better qualified than the candidates at the top of the eligibility list.

The Commission, with all three commissioners present, discussed Kapler's recommendations on February 27, 2006. Also on that date, Kapler withdrew recommendations for two additional candidates—Candidate 2 because Kapler did not expect the results of the candidate's medical examination in time for hiring and Candidate 5 because he did not have his NREMT certification when the eligibility list was certified. Of the top 13 candidates, Kapler did not recommend six, leaving the Commission with only seven recommended candidates (and at least nine are needed for the "rule of three"). Kapler then requested an additional four candidates for interviews.

The Commission later voted to permit the three candidates Kapler had not recommended because they lacked NREMT certification or were not NREMT-registry eligible—Candidates 3, 5 and 10 (collectively, "non-NREMT candidates") to continue in the selection process. The Commission decided that the non-NREMT candidates were eligible for appointment because it determined that the information provided to candidates regarding the meaning of NREMT "registry eligible" was ambiguous. On March 15, 2006, Kapler issued a memorandum recommending Candidates 1 through 3 and 5 through 10 for appointment to satisfy the rule of three for seven positions.[8] Kapler testified that he changed his recommendation as to the non-NREMT candidates

---

[8]The record does not reflect why Kapler changed his recommendation with respect to Candidate 2, and appellants do not challenge Kapler's changed recommendation with respect to Candidate 2.

"[o]nce the Commission declared them eligible." Kapler made no mention of the protected-group candidates or Candidates 11 through 13 in his March 15 memorandum. At a Commission meeting on the same day, Withers and Powers voted to present the candidates as recommended by Kapler to the City Council. Commissioner Roger Field was not present.

The City Council appointed Candidates 1 through 3 and 5 through 8 as firefighters on March 20, 2006. Shortly after the City Council's appointments, the press released the news that Candidate 3 had been convicted of vehicular homicide. In response to calls from constituents about the appointments, City Councilman Carr investigated Rochester's hiring process. During the course of his investigation, Carr came to believe that the SAFER grant *required* Rochester to seek, recruit, and appoint women and minorities. Carr testified that he called Field and described the conversation as follows:

> I said—the first question I asked [Field] was are you aware of all of the terms and conditions of the SAFER grant. And then he said, "What do you mean?" And I said, "Well, they stipulated you hire women and minorities." And he said, "I knew nothing of that." He said, "Had I known, I would have recommended that the City not take the grant." He said the City should never have taken the grant if that was the stipulation.

At an emergency meeting called to decide whether to reconsider the appointments based on the appointment of a convicted felon, Carr attempted to discuss whether Rochester had complied with the SAFER grant. Deputy City Attorney David Goslee advised the City Council that compliance with the SAFER grant was not a topic for the emergency meeting. The City Council did not discuss the SAFER grant and decided not to reconsider the seven appointments, resulting in the hiring of Candidates 1 through 3 and 5 through 8. At some point Carr also had a conversation

with Withers, during which time Withers allegedly told Carr that the Commission wanted to hire Candidate 3 (the convicted felon) because he is a "big, strong guy."[9]

Torgerson and Mundell filed discrimination charges with the Minnesota Department of Human Rights (MDHR) and the Equal Employment Opportunity Commission (EEOC). The MDHR found that the evidence did not substantiate Torgerson and Mundell's allegations in March, 2007. The EEOC adopted the MDHR's findings. Torgerson and Mundell then filed suit in district court, asserting claims of national origin, sex, and race discrimination under Title VII, the MHRA, and § 1981.

Rochester moved for summary judgment, and the district court granted Rochester's motion. The district court first found that Torgerson's § 1981 claim should be dismissed because his discrimination claims were based on national origin—not race—and national-origin discrimination alone is insufficient to support a § 1981 claim.

Next, the district court found that Torgerson and Mundell failed to present direct evidence of discrimination in support of their Title VII claim. The court assumed that both Torgerson and Mundell made a prima facie case on the claim, but found that neither Torgerson nor Mundell presented evidence discrediting Rochester's reason for not hiring them or offered any evidence giving rise to an inference of discrimination. The district court, therefore, concluded that the appellants did not meet their burden of showing that Rochester's stated non-discriminatory reason for not hiring Torgerson and Mundell—that the appellants scored lower than the hired candidates during the testing phase and the interview portion showed the appellants were lacking in qualifications—was mere pretext for discrimination.

---

[9]The record is unclear exactly when this statement was made.

II. *Discussion*

A. *Summary Judgment Standard*

Torgerson and Mundell argue that the district court erred when it granted Rochester's motion for summary judgment. The appellants allege that the district court, contrary to the summary-judgment standard, impermissibly weighed and evaluated evidence and reached conclusions not proper for summary judgment. The appellants also argue that the district court used a "pretext plus" standard now rejected by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Rochester responds that the district court properly granted its motion for summary judgment because Torgerson and Mundell presented no evidence that either discredited Rochester's reason for not hiring them or raised an inference of discrimination, either through direct or indirect evidence.

We review grants of summary judgment de novo. *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 342 (8th Cir. 2006). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotations and citation omitted). Notably, we have repeatedly emphasized that "summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117 (8th Cir. 2006); *see also Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005) ("Summary judgment should seldom be granted in employment discrimination cases because intent is often the central issue and claims are often based on inference."); *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004) ("However, in employment discrimination cases, because intent is inevitably the central issue, we apply the standard with caution."); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999) ("Summary judgment seldom should be granted in discrimination cases where inferences are often the basis of the claim. . . ."); *Bassett v. City of Minneapolis*, 211 F.3d 1097 (8th Cir. 2000) (collecting cases stating same). "We have also stated, however, that no separate

-12-

summary judgment standard exists for discrimination or retaliation cases and that such cases are not immune from summary judgment." *Wallace*, 442 F.3d at 1118; (citing *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999) ("[T]here is no 'discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.")).

We have also repeatedly cautioned that summary judgment should not be granted in "close" cases. "[T]he need to resolve factual issues in close cases is the very reason we have juries." *First Nat'l Bank of Omaha v. Three Dimension Systems Products, Inc.*, 289 F.3d 542, 545 (8th Cir. 2002); *see also Kehoe v. Anheuser-Busch, Inc.*, 995 F.2d 117, 120 (8th Cir. 1993) (reversing grant of summary judgment in "very close case").

Summary judgment is thus proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

B. *Alleged Discrimination*

Torgerson and Mundell make disparate treatment claims under Title VII and the MHRA alleging discrimination on the basis of Torgerson's national origin and

-13-

Mundell's sex. Title VII provides that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's . . . sex . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The MHRA states that "it is an unfair employment practice for an employer, because of . . . national origin [or] sex . . . to . . . refuse to hire" or "discriminate against a person with respect to hiring . . . ." Minn. Stat. § 363A.08, subd. 2. The court analyzes MHRA and Title VII claims using the same standard. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).

The two parties here agree that there are multiple ways to prove or disprove a Title VII claim, either with a showing of direct evidence or by creating the requisite inference of unlawful discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

> We have long recognized and followed this principle in applying *McDonnell Douglas* by holding that a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas*

-14-

analysis, including sufficient evidence of pretext. *See, e.g., Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

*Griffith*, 387 F.3d at 736.

We hold that Torgerson and Mundell created the requisite inference of unlawful discrimination under a *McDonnell Douglas* analysis, including sufficient evidence of pretext, and therefore may present their claims to a jury. See *infra* part II.B.1.c.

## 1. *Indirect Evidence*

Under the *McDonnell Douglas* framework, the appellants must first make out a prima facie case for discrimination. 411 U.S. at 802. Then, the burden shifts to Rochester to "articulate [a] legitimate, nondiscriminatory reason" for not hiring Torgerson and Mundell. *Id*. "[T]he ultimate burden [then] falls on [Torgerson and Mundell] to produce evidence sufficient to create a genuine issue of material fact regarding whether [Rochester's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Pope v. ESA Serv., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005).

## a. *Prima Facie Case*

The *McDonnell Douglas* framework requires the appellants to first establish a prima facie case of discrimination. A plaintiff can establish a prima facie case of discrimination by showing that

> "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications."

*Sallis v. Univ. of Minn.*, 408 F.3d 470, 475 (8th Cir. 2005) (quoting *McDonnell Douglas*, 411 U.S. at 802).

Rochester argues that Torgerson and Mundell did not make out a prima facie case because they failed to show that firefighter positions were given to other people with Torgerson and Mundell's qualifications. In support, Rochester contends that the people who received the firefighter jobs were not similarly situated to the appellants because they were ranked higher on the eligibility list due to their higher scores on both the objective and subjective testing and interviewing. Torgerson and Mundell bear the burden to prove that the employees ultimately hired were similarly situated in all relevant respects. *Harvey*, 38 F.3d. at 972. Torgerson and Mundell did present evidence showing they had similar qualifications to the candidates who were ultimately hired, such as similar education and medical certifications.

We recognize that there was a difference—the candidates ultimately hired were ranked higher on the eligibility list. However, a close review of the record shows that the rankings were significantly impacted by the subjective interview process, which accounted for 40 percent of the final score. While the final difference between the top-weighted score (91.826) and lowest-weighted score (68.120) appears large, the disparity between the candidates in only the objective portion of the testing was in fact much closer. Of the 48 eligible candidates, the top score in the objective portion was 55.95, while the low score was 48.60. Conversely, in the subjective interview portion of testing, the high score was 34.064, while the low was 15.620, a significantly greater disparity than seen in the objective portion. Again, considering only the objective written and physical portions of the hiring process, Torgerson's weighted score was 50.85, which put him ahead of the objective score of hired Candidate 8 (50.55) and tied him with hired Candidate 6 (50.85). Mundell's objective weighted score of 50.25 put her within three-tenths of a point of hired Candidate 8.

Finally, while this higher overall ranking is a difference between candidates, it is not as material as not being qualified for the job, and it is undisputed that all of the candidates were qualified. Torgerson and Mundell's burden to show that they are similarly situated and subject to disparate treatment at this prima facie stage is not a difficult one to prove, and it is appropriate to apply a low-threshold standard. *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To meet this low-threshold standard, Torgerson and Mundell must show that they possessed similar qualifications to other candidates and were treated differently, in this case, not hired. *Cf. Wheeler*, 360 F.3d at 857 (holding that for purposes of evaluating a prima-facie case it is appropriate to consider whether the employees who are black were involved in or accused of the same or similar conduct as white employees but disciplined in different ways). We find that Torgerson and Mundell have met this low standard.

With a prima facie case established, we thus move on to the second prong of the *McDonnell Douglas* framework.

### b. *Legitimate, Nondiscriminatory Reasons*

Upon establishment of a prima facie case, the burden shifts to Rochester. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). Rochester met this non-onerous burden with its proffered reason for not hiring Torgerson and Mundell: "[Rochester] did not hire Appellants because both scored significantly lower than other candidates. It also did not hire Appellants because their interviews with Chief Kapler only confirmed what the testing phase had shown: both Appellants were lacking in qualifications as compared to the higher ranking candidates."

c. *Pretext for Intentional Discrimination*

Torgerson and Mundell argue that Rochester's stated reason for not hiring them is pretext for discrimination. As a preliminary matter, appellants assert that the district court held them to an incorrect legal standard when the court ruled that "[t]o succeed on this claim, Plaintiffs must both discredit [Rochester]'s reason for not hiring them and show that circumstances permit drawing the reasonable inference that the real reasons they were not hired were that Mundell is female and Torgerson's national origin is Native American." The district court cited *Johnson v. AT&T Corp.*, 422 F.3d 756 (8th Cir. 2005), to support this ruling. *Johnson* stated:

> We have recognized that the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee. Johnson is also required to show that the circumstances permit a reasonable inference to be drawn that the real reason AT&T terminated him was because of his race.

*Id.* at 763 (internal citation omitted).

Torgerson and Mundell argue that the district court's ruling is inconsistent with the standard articulated in *Reeves*, which stated that

> it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, [the Court] stated:
>
> > "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."

530 U.S. at 147 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

*Reeves* thus reaffirmed the Court's previous holding in *St. Mary's* that the trier of fact *may* infer discriminatory intent when the plaintiffs make a prima facie case and discredit the employer's proffered reason for not hiring them. *Reeves* requires the district court to determine whether reasonable inferences of discriminatory intent can be made. If the evidence is sufficient to permit a reasonable jury to make such inferences, the jury should be permitted to do so. *Reeves* does not require district courts to decide whether or how those inferences should be made only whether they can be. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id*. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

There are at least two ways a plaintiff can establish a material question of fact regarding pretext. *Wallace*, 442 F.3d at 1120. A plaintiff may show pretext with evidence that the employer's explanation is unworthy of credence because it has no basis in fact. *Id*. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason—more than the proffered reason—likely motivated the employer. *Id*. Torgerson and Mundell proffer several examples of alleged conduct that they claim show indirect discrimination: (1) the subjective nature of the hiring process, including the panel and fire chief interviews; (2) the different standards Kapler used in the fire chief interviews; (3) Kapler's reference to Torgerson and Mundell as "unfit"; (4) the hiring of some white candidates with similar or lower qualifications than the appellants; and (5) the hiring of an additional five white males after this challenged 2006 hiring process.

"Although subjective [hiring] procedures are susceptible of discriminatory abuse and require close scrutiny, subjectivity alone does not render an employment decision infirm." *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003) (internal citation omitted). Rochester's hiring process has several phases; some are objective and some are subjective. The appellants first challenge each of the subjective components: the panel interviews and the fire chief interviews.

Looking at the evidence in the light most favorable to the appellants, we ask if there is a genuine issue of material fact as to whether Rochester's reasons were pretextual. We hold that Torgerson and Mundell have produced sufficient evidence that material fact issues remain.

The panel interviews are subjective and weighted to account for 40 percent of the applicant's final score—the largest single component. The fire chief interviews were similarly subjective. While these facts alone do not prove that these interviews became tools of discrimination, the subjectivity involved does warrant scrutiny. *Id*. The district court concluded that the controls implemented by Rochester—such as using representatives from three different divisions of city government, asking predetermined questions, and using established scoring criteria—ensured that proper steps were taken to "minimize the panel interview's susceptibility to abuse." Upon review, we conclude that deciding the efficacy of Rochester's steps to ensure nondiscriminatory evaluation is, on the facts in this record, better reserved for the jury. Also, the district court acknowledged that Rochester's subjectivity controls only *minimized* susceptibility to abuse, they did not eliminate it. Thus, the material fact of potential discriminatory abuse of the subjective interview process remains.

Additionally, neither this court nor the district court can determine from the record whether Torgerson and Mundell received lower scores than other candidates who gave similar answers. The record is devoid of any notes from these panel

-20-

interviews. The reasons for their absence likely involve fact questions best resolved by the fact-finding mechanisms which will inhere in the trial.

We apply a similar analysis regarding the subjective nature of the final fire chief interview. Unlike the panel interviews, there were no controls on the subjectivity of the fire chief interview. Rochester does not deny that Kapler used a different standard when interviewing the top candidates and the candidates from the protected class. While instances of disparate treatment between applicants can demonstrate pretext, at this stage Torgerson and Mundell must prove they were similarly situated to the hired candidates "in all relevant respects." *Rodgers*, 417 F.3d at 853. "[T]he burden for establishing 'similarly situated' at the pretext stage is rigorous." *Wheeler*, 360 F.3d at 858. The appellants may not ultimately be able to carry their burden under this rigorous standard. However, when ruling on a summary judgment motion, we must only decide if there is a question of fact. Again, we find that such a question remains.

"Where . . . the employer contends that the selected candidate was more qualified . . . than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." *Chock v. Nw. Airlines, Inc.*, 113 F.3d 861, 864 (8th Cir. 1997). "If this comparison successfully challenges the employer's articulated reason for the employment decision, it might serve to support a reasonable inference of discrimination." *Chambers v. Metro. Prop. and Cas. Ins. Co.*, 351 F.3d 848, 857 (8th Cir. 2003). "[A] comparison that reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of . . . discrimination." *Chock*, 113 F.3d at 864.

A comparison in this case shows that Torgerson and Mundell possessed similar qualifications as the hired candidates, such as having (1) completed ride-alongs with the Fire Department, (2) college degrees, (3) past experience, and (4) EMT

certifications. Rochester concedes these similar qualifications but relies on Torgerson's and Mundell's lower rank on the eligibility list than the hired candidates. According to Rochester, this lower ranking means the appellants were not similarly situated. However, appellants claim they sat lower on the eligibility list because they were discriminated against during the subjective panel interviews. Taking the eligibility-list ranking out of the equation, Torgerson and Mundell appear similarly situated to the hired candidates. Based on the record before us, we conclude that there is a genuine question of material fact whether the subjective panel and fire chief interview results served as pretext for discrimination.

Torgerson and Mundell also argue that Kapler's description of them as "unfit" is evidence of discriminatory animus. Kapler made the statement to Carr at a June 2006 meeting. Carr opined that Rochester should not hire anyone else under the SAFER grant, lest a minority candidate not hired hail the city to court. Kapler responded that he interviewed Torgerson and Mundell and "found them unfit." When asked in a deposition if he thought Torgerson and Mundell to be "unfit," Kapler replied:

> Well, I guess it depends on what the word "fit" means. To us it has a specific connotation. A fitness for duty type of evaluation, mental, emotional, physical, is all part of a person's fitness for duty. So that's how I use the word fit. They are—they are on our list as qualified candidates, so yes, they're qualified to be firefighters.

The district court concluded that "Kapler's distinction between 'qualified' and 'fit' does not give rise to an inference of discrimination." However, "[a]t summary judgment, because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Here, the district court credited Kapler's proffered explanation of his use of the word "unfit." On summary judgment, the non-moving plaintiff is entitled to reasonable

inferences in his or her favor. The conclusion reached by the district court is not the only reasonable inference from the facts.[10] The jury must ultimately decide the meaning and credibility of Kapler's explanation after a trial on the merits.

## 2. *Direct Evidence*

Because we find that Torgerson and Mundell sufficiently established a genuine issue of material fact as to whether they suffered discrimination by a showing of indirect evidence of discrimination, we need not decide whether there is direct evidence of discrimination in this case and instead leave such matters to a jury.

## C. *Torgerson's § 1981 Claim*

Torgerson also claims Rochester violated 42 U.S.C. § 1981 by discriminating against him "on the basis of his national origin." Section 1981 "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). For example, if an individual is "subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin . . . [then] he will have made out a case under § 1981." *Id.* We have interpreted this ruling to hold that § 1981 does not encompass discrimination claims based upon national origin. *Zar v. S.D. Bd. of Exam'r of Psychologists*, 976 F.2d 459, 467 (8th Cir. 1992) ("This claim of discrimination based upon national origin is insufficient to state a § 1981 claim.").

---

[10]We note that, for whatever reasons, the Fire Department lacks gender and racial diversity. At the time of this appeal, Rochester had hired only three non-white firefighters in its recorded history: one Native American who is no longer with the department; one Asian, who is no longer with the department; and one African-American. Of the 105 employees at the time of appeal, there are two female firefighters (1.9 percent) and one non-white firefighter (0.95 percent). The 2000 census reports that, of individuals in the 18 to 39 year-old-age group in Rochester, 45 percent are women and 14 percent are minority.

Torgerson argues that his claim is correctly read as stating that he was discriminated against because he is Native American and that his § 1981 claim should not be dismissed because claims based on Native-American status have been treated as both race and national origin claims. Torgerson is correct that a party may bring a claim of discrimination based on his Native-American status as a claim based on race. *See Dawavendewa v. Salt River Project Agricultural Improvement & Power Dist.*, 154 F.3d 1117, 1119 n.4 (9th Cir. 1998). We agree that a claim stating that a plaintiff has been discriminated against because he *is* a Native American could be sustained under § 1981. But a race claim based on Native-American status must be so stated as a race claim, which Torgerson failed to do. Torgerson's complaint instead states, "Defendant has discriminated [ ] against Plaintiff in the formation of an employment contract *on the basis of his national origin*, in violation of 42 U.S.C. §1981." (Emphasis added). At no time did Torgerson move to amend his Complaint to include a claim of race discrimination. Torgerson testified in a deposition that he believes he was discriminated against because of his national origin, and prior to Rochester's motion for summary judgment, Torgerson never referred to race in any court documents. Because Torgerson alleges he was discriminated against based on his national origin, not race, he cannot sustain a § 1981 claim.

### III. *Conclusion*

Accordingly, we affirm the district court's dismissal of Torgerson's § 1981 claim but reverse the grant of summary judgment on Torgerson and Mundell's Title VII claim and remand to the district court for further proceedings.

BENTON, Circuit Judge, dissenting in part, and concurring in part.

I disagree with the Court's conclusion that Torgerson and Mundell "created the requisite inference of unlawful discrimination under a *McDonnell Douglas* analysis, including sufficient evidence of pretext." **Ante**, at 15. In my view, Torgerson and Mundell do not produce evidence from which a reasonable jury could find that

-24-

Rochester's stated reason for not hiring them – that they scored lower in the hiring process than candidates hired – is pretext for discrimination.

There are at least two ways a plaintiff can establish a material question of fact regarding pretext. ***Wallace v. DTG Operations, Inc.***, 442 F.3d 1112, 1120 (8th Cir. 2006). A plaintiff may show the employer's explanation is "unworthy of credence, because it has no basis in fact." ***Id.*** (quotations and citations omitted). A plaintiff may also show pretext directly, by "persuading the court that a [prohibited] reason more likely motivated the employer." ***Id.***

The Court concludes that the following evidence creates a material question as to pretext: (1) the "hiring of some white candidates with similar or lower qualifications than the appellants," (2) the subjective nature of parts of the hiring process, and (3) Fire Chief Kapler's reference to Torgerson and Mundell as "unfit." ***Ante***, at 19-23.

1. Comparison of qualifications

"Where . . . the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." ***Chock v. Northwest Airlines, Inc.***, 113 F.3d 861, 864 (8th Cir. 1997). "[A] comparison that reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of . . . discrimination." ***Id.***

After quoting *Chock*, the Court states that "Torgerson and Mundell possessed similar qualifications as the hired candidates." ***Ante***, at 21. "Similar qualifications" do "not raise an inference of . . . discrimination." ***Chock***, 113 F.3d at 864. *See also* ***Lidge-Myrtil v. Deere & Co.***, 49 F.3d 1308, 1311 (8th Cir. 1995) ("Although

[plaintiff] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual"); *Pierce v. Marsh*, 859 F.2d 601, 603 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants . . . alone does not raise an inference of . . . discrimination.").

In *Pierce*, the Army's personnel office prepared a list of job candidates in rank order. The Army hired Stokes (a black male) and Webb (a white female), who ranked ahead of Pierce (a black male). Pierce sued for race discrimination; the Army explained that Webb was more qualified, as reflected by her higher rank on the list. The district court granted summary judgment to the Army.

On appeal, Pierce stressed an exhibit indicating "that his qualifications far outweigh Webb's qualifications, thus demonstrating that the Secretary's legitimate nondiscriminatory reason for the decision to hire Webb serves as a mere pretext . . . ." *Id.* at 603. Reviewing the exhibit, this court concluded that Pierce and Webb had "relatively similar qualifications," and "neither candidate appears better qualified for the foreman position." *Id.* "Relatively similar qualifications" were not enough for Pierce to survive summary judgment. *See id.* at 604 (". . . Pierce failed to provide any evidence from which a rational trier of fact could infer that the selecting committee's articulated nondiscriminatory reason for hiring Webb over Pierce was overcome by any evidence establishing that reason as pretextual.").

Here, like Pierce, Torgerson and Mundell appeared on an eligibility list, ranked below the hired candidates. At best, they have "relatively similar qualifications" to some hired candidates. As in *Pierce*, "relatively similar qualifications" do not create a material issue of fact as to pretext.

## 2. Subjectivity of hiring process

"Although subjective [hiring] procedures are susceptible of discriminatory abuse and require close scrutiny, subjectivity alone does not render an employment decision infirm." ***Brooks v. Ameren UE***, 345 F.3d 986, 988 (8th Cir. 2003) (internal citation omitted).

Torgerson and Mundell emphasize that the panel interviews account for 40 percent of applicants' scores, and stress the wide range of scores in these interviews. But they fail to provide any evidence that the interviews were discriminatory. Panels consisted of one interviewer from Rochester's human resources department, one from the Fire Civil Service Commission, and one from the Fire Department. The interviewers received a list of (human-resources-prepared) questions to ask of all candidates and were given scoring criteria to evaluate responses. Interviewees received, in advance, the list of potential questions. Even Torgerson and Mundell agree that the questions asked were what they anticipated based on the list of possible questions, and that none of the questions was inappropriate.

After stating that the interviews "warrant [close] scrutiny," the Court concludes that "deciding the efficacy of Rochester's steps to ensure nondiscriminatory evaluation is, on the facts in this record, better reserved for the jury," and "the material fact of potential discriminatory abuse of the subjective interview process remains." *Ante*, at 20. The Court does not refer to any evidence that discrimination took place [11] – only to the "potential" for discrimination in the interviews. Plaintiffs cannot

---

[11] The Court notes that Torgerson scored better than one, and equal to another, hired candidate on the written and agility tests (and Mundell almost scored equal to the lowest-scoring hired candidate). *Ante*, at 16. But the fact remains: "At the end of the objective written and agility phases . . . Torgerson was ranked 41st and Mundell was ranked 46th out of 48 candidates." *Ante*, at 6. Thus, the interview scores significantly affected the ranking of other candidates. The interview scores did not

-27-

survive summary judgment by identifying a part of the hiring process where there is only "potential" for discrimination. Again, "subjectivity alone does not render an employment decision infirm." **Brooks**, 345 F.3d at 988.

In *Pierce*, as in this case, hiring officials ranked qualified candidates on a list based on a combination of factors. This court said:

> The selecting officials testified by affidavit that subjective factors, *i.e.*, their evaluation based on personal observation of the candidates, also entered into the selection decision. Even if these subjective reasons could be rejected on credibility grounds, such a rejection of that evidence would not add anything to the lack of a showing of pretext by Pierce.

**Pierce**, 859 F.2d at 603-04. Here, the fact that parts of the hiring process were more subjective does not add anything to the lack of showing of pretext by Torgerson and Mundell.

The Court notes that "neither this court nor the district court can determine from the record whether Torgerson and Mundell received lower scores than other candidates who gave similar answers [in the panel interview]," and concludes the "reasons for their absence likely involve fact questions best resolved" at trial. **Ante**, at 20-21. The burden, however, is on Torgerson and Mundell to provide evidence of pretext. *See, e.g.*, **Ramlet v. E.F. Johnson Co.**, 507 F.3d 1149, 1153 (8th Cir. 2007) (If the defendant provides a non-discriminatory reasons for its decision, "the presumption [of discrimination] disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for . . . discrimination"); **Pope v. ESA Serv., Inc.**, 406 F.3d 1001, 1007 (8th Cir. 2005) ("[T]he ultimate burden falls on [plaintiffs] to produce evidence sufficient to create a genuine issue of material fact

----

significantly affect the rankings of Torgerson or Mundell, who ranked low *before* and *after* the interviews.

regarding whether [the employer's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination."). Here, a reasonable jury could not infer pretext from the *absence* of this evidence. *See Pineda v. UPS*, 360 F.3d 483, 487 (5th Cir. 2004) ("To satisfy this burden, the plaintiff must offer some evidence that permits the jury to infer that the proffered explanation was a pretext for discrimination. The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so.") (internal quotations and alterations omitted).

Torgerson and Mundell's objections to the process creating the eligibility list are unpersuasive. Rochester's explanation of its hiring decisions has a "basis in fact." *See Wallace*, 442 F.3d at 1120.

3. Fire Chief Kapler's description of Torgerson and Mundell as "unfit"

Torgerson and Mundell may also show pretext by "persuading the court that a [prohibited] reason more likely motivated the employer." ***Id.***

City Councilmember Patrick Carr testified that Fire Chief Kapler said he did not hire Torgerson and Mundell because he "found them unfit." At his deposition, Fire Chief Kapler explained his remark, distinguishing "fit" from "qualified." The Court states that "the district court credited Kapler's explanation of his use of the word 'unfit,'" which "is not the only reasonable inference from the facts." [12] *Ante*, at 22-23.

Nothing in the record suggests Fire Chief Kapler's use of "unfit" was based on national origin or gender. Minnesota law requires "public competitive examinations

---

[12] The Court notes statistical evidence in support of its conclusion. *Ante*, at 23 n.10. "[S]tatistical evidence will rarely suffice to rebut an employer's legitimate, non-discriminatory reasons for a particular adverse employment action." ***Bogren v. Minnesota***, 236 F.3d 399, 406 (8th Cir. 2000).

-29-

to test the *relative fitness* of applicants." Minn. Stat. § 420.07(2) (emphasis added). "While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation." ***Twymon v. Wells Fargo & Co.***, 462 F.3d 925, 934 (8th Cir. 2006). "Facially race-neutral [or gender-neutral] statements, without more, do not demonstrate [discriminatory] animus on the part of the speaker." ***Id.*** *See also **Hannoon v. Fawn Eng'g Corp.***, 324 F.3d 1041, 1047 (8th Cir. 2003) ("Because the comments regarding body odor did not suggest any reference to race or national origin, we are unwilling to hold such comments reasonably capable of supporting an inference of discriminatory intent.").

### 4. Other evidence

Although the Court does not specifically rely on it, other evidence the Court references does not support an inference of discrimination, when read in context. *See **Twymon***, 462 F.3d at 934. Councilmember Carr testified that Fire Commissioner John Withers – who was on the panel that interviewed Torgerson – said he recommended a convicted felon for a firefighting position because he is "a big, strong guy." As Carr makes clear, this statement came in the context of a conversation about a *particular* male candidate, not about other applicants.

Councilmember Carr also testified about an exchange with Fire Commissioner Roger Field:

> I said—the first question I asked [Field] was are you aware of all the terms and conditions of the SAFER grant. And then he said, "What do you mean?" And I said, "Well, they stipulated you hire women and minorities." And he said, "I knew nothing of that." He said, "Had I known, I would have recommended that the City not take the grant." He

said the City should never have taken the grant if that was the stipulation.

As the district court noted, Carr's description "of the SAFER grant failed to mention the qualifying language 'to the extent possible' . . . . Testimony that Field recommended against taking a grant that 'stipulated' the City hire women and minorities, regardless of relative qualifications, is not evidence of discriminatory animus." As the district court concluded, "Field's statement is unrelated to any challenged step in the decisional process . . . ."

Torgerson and Mundell stress that when Fire Chief Kapler conducted the final interviews of candidates from the top of the eligibility list, he looked only for "red flags," but when interviewing those at the bottom (them), he looked for "something about [them] that would elevate them to the level of being better than the candidates who were at the top of the list." This cannot reasonably be construed as discriminatory because, despite moving on to the fire-chief interview, Torgerson and Mundell retained their ranks on the eligibility list. As the Court recognizes, "although all candidates on the eligibility roster meet the minimum qualifications for the firefighter position, those at the top of the list are recognized as more qualified for the position than those at the bottom of the list." *Ante*, at 4.

* * *

Torgerson and Mundell fail at step three of the *McDonnell Douglas* analysis: they do not offer evidence from which a reasonable jury could conclude Rochester's reason for not hiring them was pretextual.

I would affirm the judgment of the district court in all respects, and I therefore dissent in part.

_____

-31-