**Troy L. SCHAEFER and Randall D. Muhm, Plaintiffs,**

**v.**

**Sheriff Joe YOCUM, in his individual capacity and in his official capacity as Sheriff of Seward County, Nebraska, and Dan Hejl, Defendants.**

No. 4:11–CV–3039.

United States District Court, D. Nebraska.

April 16, 2012.

Joel A. Bacon, Jefferson Downing, Gary L. Young, Keating, O'Gara Law Firm, Lincoln, NE, for Plaintiffs.

Charles W. Campbell, Angle, Murphy Law Firm, York, NE, for Defendants.

## MEMORANDUM AND ORDER

### JOHN M. GERRARD, District Judge.

This matter is before the Court on the defendants' motion for summary judgment (filing 35). For the following reasons, the Court finds that the defendants' motion should be granted in all respects.

## I. BACKGROUND

At the time of the events underlying this case, defendant Joe Yocum was the duly elected sheriff of Seward County, Nebraska. He was nearing the end of his third term and running for reelection to a fourth term. (Filing 36–1 at 1.) Defendant Dan Hejl was the chief deputy sheriff of Seward County. (Filing 36–2 at 1.) Plaintiffs Troy L. Schaefer and Randall D. Muhm were deputy sheriffs. (Filing 36–1 at 1–2.) Yocum's opponent in the general election was Pat Dorcey. (Filing 47–1 at 1.) Schaefer and Muhm, among others working for Yocum, supported Dorcey's candidacy. (Filing 47–1 at 1.)

Yocum was reelected sheriff in November 2010. (Filing 36–1 at 1.) On January 4, 2011, Schaefer and Muhm each received letters from Yocum informing them that their appointments as deputy sheriffs were to expire as of January 5, and that Yocum had decided not to reappoint them. (Filing 36–2 at 106–07.) The effectively identical letters identified citizen complaints, "supervisory review," "counseling," and "admissions by you that your behavior was unprofessional" as among the reasons for

the decision not to reappoint Schaefer and Muhm. (Filing 36–2 at 106–07.)

Schaefer and Muhm contend that they were actually terminated because of their support for Dorcey's campaign, in violation of their First Amendment rights, and they have presented evidence they claim supports that theory. The defendants contend that the terminations [1] were motivated by alleged misconduct, and they present evidence supporting that theory. Because each side's argument rests on essentially separate factual narratives, it will make the most sense to relate each separately.

### 1. CAMPAIGN ACTIVITIES AND ALLEGED THREATS

Muhm and Schaefer each claim that their support for Dorcey's candidacy was well known to the defendants and in the sheriff's office. (Filings 47–1 at 1 and 47–2 at 1.) According to Muhm, Yocum asked Muhm and his wife to help with Yocum's campaign on at least two occasions, but they declined. (Filing 47–1 at 3.) Muhm avers that in May 2010, he had a "lengthy meeting" with Yocum during which Yocum told Muhm that he could support any candidate he chose, but Yocum warned Muhm not to " 'bad mouth' " him. (Filing 47–1 at 2).

According to both Muhm and Schaefer, Sergeant Michael Vance had also been a Dorcey supporter at the beginning of the campaign. (Filings 47–1 at 2 and 47–2 at 1.) But they say that changed after Muhm overheard Hejl tell Vance that " 'anybody caught supporting Dorcey would be fired.' " (Filings 47–1 at 2 and 47–2 at 1–2.) The plaintiffs claim they saw Vance deleting emails from his work computer,

---

1. The Court recognizes the potential distinction between declining to renew the plaintiffs' appointments and "termination" of their employment. However, neither party contends that such a distinction is legally meaningful in this case, and it appears that for all practical purposes, the plaintiffs were "terminated" or "fired." For the sake of clarity, in this Memorandum and Order, the Court will use those terms.

and that he advised them to do the same. Thereafter, Vance became an active supporter of Yocum. (Filings 47–1 at 2 and 47–2 at 2.) And both plaintiffs claim Vance warned them that anyone caught supporting Dorcey would be fired. (Filings 47–1 at 3 and 47–2 at 2.) In addition, Muhm claims he was told, by Vance, that Yocum had seen Muhm's daughter and another deputy's wife at the Dorcey campaign booth at the county fair, wearing Dorcey campaign t-shirts, and that Yocum was upset by it. (Filing 47–1 at 3.)

Vance denies nearly all of that. Specifically, Vance avers that he was friends with Dorcey, but he never supported Dorcey's candidacy. (Filing 52–2 at 1.) Vance avers that he never deleted any emails, although he did delete Dorcey as an email contact in order to avoid further communications with him during the campaign. (Filing 52–2 at 1.) Vance says that although Hejl made it clear to deputies that they were not to do any campaigning on duty, neither defendant pressured him to support Yocum. (Filing 52–2 at 1–2.) Vance denies being told by Yocum about seeing Muhm's daughter or the other deputy's wife at the county fair, and denies telling Muhm about any such conversation. (Filing 52–2 at 2.) Yocum denies having seen them. (Filing 52–1 at 2.) And Vance denies Hejl told him anyone supporting Dorcey would be fired, and denies making any such statement himself. (Filing 52–2 at 2.) Hejl also denies making any such statement. (Filing 36–2 at 3.)

Matters came to something of a head in August and September 2010 over the firing of Patti Lee, a probation officer. Schaefer suspected that Lee had been fired because Vance and Yocum had seen her wearing a Dorcey campaign t-shirt, and that Vance had made a complaint.

(Filing 47–2 at 2.) Muhm said Vance told him that Yocum was upset by Lee's wearing of the t-shirt. (Filing 47–1 at 3.) Yocum avers that Schaefer called him and threatened to " 'fuck [Vance] up' " if Vance was responsible for Lee's firing. (Filing 36–1 at 7). Schaefer admits that he made an "imprudent remark" about Vance. (Filing 47–2 at 2–3.)

Yocum held a meeting to address the matter, and explained that no one from the sheriff's office had been involved in the firing. (Filing 36–1 at 7). According to Yocum, Muhm said he had been told by Vance that Yocum was "mad" at him for not supporting Yocum in the upcoming election. (Filing 36–1 at 7). Vance replied by clarifying that Yocum was "hurt" to find out that any of his deputies would not support him. According to Yocum, Muhm replied, " 'You're right, you did say he was hurt.' " (Filing 36–1 at 7). Yocum says he told everyone at the meeting—including the plaintiffs—that he hoped all of his employees supported him, but he did not care who they supported. He also told them that he did not want anyone to " 'bad mouth' " him and that he expected them to be loyal to the department.[2] (Filing 36–1 at 7–8). Neither plaintiff denies or contradicts Yocum's account of this meeting.

Schaefer also contends that shortly before the election, Hejl and Sergeant Dan Nantkes visited three businesses in Seward County, including a bar and grill owned in part by Schaefer's mother. Schaefer avers that Nantkes threatened to " 'ruin their business' " over Dorcey campaign signs being displayed. (Filing 47–2 at 3.) The record also contains a newspaper article about the campaign that repeated similar allegations. In the article, Hejl and Nantkes each explained that

**2.** It is not entirely clear whether Muhm's recollection of a similar remark at an earlier meeting reflects two different meetings or two different recollections of the same meeting. But the discrepancy is not important.

what they had done was inform the management of each business that they would spend their personal money elsewhere because of the Dorcey signs. (Filing 47–1 at 12–13.) Schaefer says he called Yocum repeatedly to ask about the incident, but that Yocum never returned his calls. (Filing 47–2 at 3.) Yocum says that Schaefer never spoke with him about such a matter before he was fired. (Filing 52–1 at 3.)

### 2. ALLEGED MISCONDUCT OF PLAINTIFFS

The defendants contend that the plaintiffs' termination was based on a citizen complaint that Schaefer and Muhm had violated police procedure while pursuing a suspect, Casey Jones. The Court notes that initially, in support of their motion for summary judgment, the defendants seemed to suggest that the firings were warranted by other misconduct: a citizen complaint alleging a confrontation between Muhm and one of his neighbors, and Schaefer's alleged insubordination with respect to Lee's firing.[3] But in their reply brief, the defendants focus exclusively on the Jones incident as the alleged basis for the plaintiffs' termination, see filing 51 at 23, even complaining that the plaintiffs' evidence concerning the other incidents is irrelevant. For purposes of this motion for summary judgment, based upon the defendants' briefing, the Court confines its discussion of the defendants' stated justification for the plaintiffs' termination to the Jones incident.

The actual events of the incident, late on the evening of December 5, 2010, are mostly undisputed, although there are disputes on a couple of key points. It is clear that Schaefer and Muhm responded to a call for assistance from Deputy Ryon Blath in apprehending a suspect, Casey Jones, who had fled from a traffic stop. (Filing 47–2 at 4.) Jones had been driving

the vehicle, but his only driver's license was an expired learner's permit. (Filings 36–1 at 100 and 47–2 at 4.)

Blath's police dog tracked Jones to near the door of a trailer home in a nearby trailer park. (Filing 47–2 at 4.) Muhm knew the trailer home to belong to a Rita Jones. (Filing 47–1 at 7.) The trailer home was in fact owned by Richard and Rita Jones (no relation to Casey Jones), but they were out of town. They had given permission to their daughter and son-in-law, Sarah and Ben Johnson, to stay in the trailer. The Johnsons were sleeping in the back room with their baby, and their friend, Amanda Luebcke, was sleeping on the living room couch. (Filings 36–5 at 1 and 36–8 at 1.)

After being led to the trailer by Blath's dog, Blath went to the back door while Muhm and Schaefer went to the front. (Filing 47–2 at 4.) Schaefer knocked, and Luebcke answered. (Filing 47–2 at 4.) According to Schaefer, he asked her if she had seen Casey Jones, and she said she had not, but that she had been asleep. (Filing 47–2 at 4.) Schaefer says he asked if the door to the trailer had been locked, and she said it had not. (Filing 47–2 at 4–5.) Schaefer's affidavit does not mention asking for permission to enter the residence, but Muhm avers that Schaefer asked for permission to enter, and Luebcke responded, " 'I guess so.' " Muhm specifically avers that neither deputy pointed a weapon at Luebcke. (Filing 47–1 at 7.)

Luebcke, on the other hand, says that after she was asked if Casey Jones was there, she said he was not, and started to close the door. But one of the deputies placed his foot in the door to prevent it from closing. According to Luebcke, one

---

3. In their brief, for instance, the defendants asserted that the plaintiffs' "misconduct in relation to [the pursuit] incident, coupled with previous instances of misconduct by both Plaintiffs earlier in the year, were the reasons for their termination." Filing 37 at 24.

of the deputies then pointed a weapon at her and told her that if Casey Jones was in the residence, she was going to jail. She asked them to identify themselves, and they said they "were part of the K9 unit" and knew that the individual they were looking for was inside the trailer. Luebcke says she told them they were mistaken and tried to close the door again, but that the deputies pushed the door open and went past her. (Filing 36–8 at 1.)

By this time, Ben Johnson had woken up and came out to see what was happening. Johnson says that when he reached the kitchen, he saw a police officer pointing a flashlight and gun at his face. Johnson says he was asked to identify himself and did so. One of the deputies said they were police officers looking for Casey Jones, and Johnson said he did not know who that was. (Filing 36–5 at 1.) Luebcke says that she heard Johnson say, "'Whoa, you don't have to point that at me.'" (Filing 36–8 at 1.) The deputies continued to search the trailer and, according to Johnson and Luebcke, overturned the couches and broke a glass bowl in the bedroom before leaving. (Filings 36–5 at 2 and 36–8 at 2.)

Schaefer does not, at this point, deny pointing his weapon at Johnson. He explains that it is standard procedure to have a weapon ready when searching a building, and to point that weapon at an unknown subject who comes around the corner in a dimly-lit room until it can be determined if the person is a threat. In addition, Schaefer's service weapon had a light on it. So, Schaefer says, when Johnson came around the corner, he raised his weapon and shined his light on Johnson in order to identify him, but lowered the weapon as soon as he determined that it was not Casey Jones. (Filing 47–2 at 5.) Muhm says that he did not see Schaefer point his weapon at Johnson. (Filing 47–1 at 7–8.) Both Muhm and Schaefer deny overturning furniture or knowingly breaking any

items. (Filings 47–1 at 7–8 and 47–2 at 6.) Casey Jones was not found that evening. (Filing 36–1 at 99.)

Yocum first became aware of the incident on December 8, 2010, when Rita Jones called the sheriff's office to complain. (Filings 36–3 at 1 and 36–6 at 1–2.) No written reports had been filed at that time. (Filing 36–3 at 1.) On December 17, Amber Coufal, the sheriff's office manager, called Richard Jones on what appears to have been unrelated business, and he asked Coufal if she could provide him with any information on his wife's complaint. (Filing 36–4 at 1.) She said she would check on it and get back to him. Later that day, Schaefer called into the office and Coufal told him about the telephone call. According to Coufal,

> Schaefer told me at that time that the officers did not barge through the front door, but that a female had allowed them to enter the residence. Schaefer then told me that the only thing that they, referring to Sheriff Yocum and Chief Deputy Hejl, were going to raise a stink about was the fact that a guy came around the corner inside the trailer, and he had to draw down on him, as he (Schaefer) thought it was the person that they had followed into the house. Schaefer then stated to me that it wasn't the first time that he drew down on the wrong person.

(Filing 36–4 at 1.) Schaefer denies admitting to Coufal that he had pointed his service weapon or "drew down" on prior occasions. (Filing 47–2 at 6.)

Hejl says that later that day, he was working on a court security detail when Schaefer called him on his cellular telephone to make him aware of the incident at the Jones' trailer. (Filing 36–2 at 1.) Schaefer's description of the incident was essentially consistent with his current account. (Filing 36–2 at 1–2.) Hejl later

found out that Schaefer had been informed about the citizen complaint. (Filing 36–2 at 2.) Hejl prepared a report of Schaefer's call for Yocum. (Filing 36–2 at 2, 4).

Yocum directed Schaefer, Muhm, and Blath to prepare reports on the incident. (Filing 36–1 at 10.) Yocum received those reports on December 23, 2010. (Filing 36–1 at 12.) Schaefer's report was essentially consistent with his current account, except that he did not mention drawing his weapon instead, he reported that "a male subject came around the corner, threw [sic] the kitchen[.] I shined my light at that subject[;] realizing it was not Casey Jones, I asked them if there was anyone else in the trailer." (Filing 36–1 at 101.) But in a meeting between Schaefer, Yocum, and Vance *before* Schaefer authored his written report, Schaefer had admitted pointing his weapon at Johnson. (Filings 36–1 at 12 and 36–7 at 1.)

Muhm's report stated that neither "Schaefer nor I had any weapons pointed at anyone during our time in the trailer. . . ." (Filing 36–1 at 105.) Muhm maintains that this statement was truthful; Muhm avers that he never saw Schaefer point his weapon at Johnson. (Filing 47–1 at 7–8.) But according to Vance, Schaefer had said that he and Muhm were together the entire time they were in the residence. (Filing 36–7 at 4.)

Yocum avers that:

Based upon the statements and information that I received ... I determined that Deputy Schaefer was deceptive in his written report to me in which he did not mention that he pointed his firearm at the male occupant in the trailer. I further determined that Deputy Muhm lied when he denied that any weapons were pointed at anyone during the time that the deputies were in the trailer. . . .
It appeared to me that the three deputies involved in the incident at the Jones' trailer on December 5, 2010 attempted to cover up the incident by failing to report it, and in the cases of Schaefer and Muhm, by submitting reports that were dishonest in their description of the events that occurred during the incident. . . . For these reasons it was my opinion that the descriptions of the incident of December 5, 2010 by Schaefer and Muhm lacked credibility. I believed that if the officers were dishonest about Schaefer's pointing of a weapon at the male occupant, that they were also likely dishonest in their description of their entry into the trailer and their conduct inside the trailer. . . . I was extremely concerned that the officers would enter a trailer home in which people were sleeping at midnight simply for the purpose of searching for a person whom they believed to have been driving without a valid license, a minor traffic offense. This offense certainly did not justify the officers in entering an occupied dwelling at that time of night. . . . It appeared to me based upon all of the information that I was provided that the officers' conduct violated the Fourth Amendment rights of the occupants and owners of the trailer by engaging in an unlawful search and seizure, and that the pointing of a firearm at the male occupant was an excessive use of force. . . . Based upon the information that I was provided it was my belief that the actions of Deputies Schaefer and Muhm further violated the policies of the Seward County Sheriff's Office as well as the constitutional rights of the owners and occupants of the Jones' trailer in regard to the incident that occurred on December 5, 2010. . . . I decided that I could not continue to employ Deputies Schaefer and Muhm based upon their conduct at the Jones' trailer on December 5, 2010, their subsequent handling of that incident, including their delayed reports and their dis-

honest descriptions of the incident. . . . For all of these reasons I decided to terminate their employment by advising them in writing that they would not be reappointed as Seward County deputy sheriffs and that their employment was terminated on January 5, 2011.

(Filing 36–1 at 14–15.) Yocum further avers that his decision to terminate the plaintiffs "had nothing to do with any support they might have provided to my opponent in the 2010 general election, and likewise had nothing to do with any opinions or statements that either of them might have made expressing support for my opponent in the election." (Filing 36–1 at 15.)

### 3. PROCEDURAL HISTORY

Schaefer and Muhm sued Yocum and Hejl in this Court;[4] their operative complaint (filing 22) alleges that the defendants violated their First Amendment rights and are liable "under 42 U.S.C. §§ 1981, 1983, and 1988. . . ." (Filing 22 at 4.) Yocum was sued in both his individual and official capacities. (Filing 22 at 1.) The defendants' operative answer (filing 26) denies liability and alleges an affirmative defense of qualified immunity. The defendants then filed the motion for summary judgment (filing 35) currently before the Court.

## II. ANALYSIS

### 1. SUMMARY JUDGMENT STANDARDS

The Court's analysis begins with some well-established propositions. Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c)(2). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County,* 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 791–92 (8th Cir.2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson, supra,* 643 F.3d at 1042.

It is also important to note, for reasons that will become apparent, that an affidavit or declaration used to support or oppose a motion must be made on personal knowl-

---

**4.** Blath was also one of the original plaintiffs, *see* filing 1, but is no longer named as a plaintiff in the operative complaint (filing 22).

edge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed.R.Civ.P. 56(c)(4). A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed.R.Civ.P. 56(c)(3). The Court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial. *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307 (8th Cir.1993). While the Court reviews the record in the light most favorable to the nonmoving party, that presumption does not stretch so far as to consider as evidence statements found only in inadmissible hearsay. *Mays v. Rhodes,* 255 F.3d 644 (8th Cir.2001). Inadmissible hearsay evidence alone may not defeat a summary judgment motion. *Thien, supra.*

2. FIRST AMENDMENT RETALIATION CLAIM

■ A government employer cannot take adverse employment actions against its employees for exercising their First Amendment rights. *Shockency v. Ramsey County,* 493 F.3d 941 (8th Cir.2007). To establish a prima facie case of retaliatory termination, a plaintiff must both allege and prove that (1) his speech was protected by the First Amendment, (2) the gov-ernmental employer discharged him from employment, and (3) the protected speech was a substantial or motivating factor in the defendant's decision to take the adverse employment action. If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that the same employment action would have been taken in the absence of the protected activity. *Rynders v. Williams,* 650 F.3d 1188 (8th Cir.2011); *Davison v. City of Minneapolis, Minn.,* 490 F.3d 648 (8th Cir.2007); *see, also, Wagner v. Jones,* 664 F.3d 259 (8th Cir.2011).[5]

It is not disputed here that the plaintiffs engaged in activity—participation in electoral activities—that is protected by the First Amendment. *See Shockency, supra.* The First Amendment protects public employees from discharge based on what they have said, and it also protects them from discharge based upon political allegiance. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). It is not clear whether this case would be better regarded as a speech or affiliation case.[6] But the distinction, in this case, is not significant. Speech and affiliation cases differ in the inquiry that the Court would undertake if an employer argued that an employee's affiliation or speech was an

---

5. The Court is aware of some disagreement among Eighth Circuit panel decisions regarding whether this framework, based in *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), or the more defendant-friendly tripartite burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), should be applied in cases that do not involve so-called "direct evidence" of discrimination. *See, Wagner, supra; Rynders, supra; Hughes v. Stottlemyre,* 506 F.3d 675 (8th Cir.2007); *Davison, supra.* The Court does not need to resolve that disagreement here because (1) both parties rely on the *Mt. Healthy* framework, *see Davison, supra,* and (2) the Court finds that the plaintiffs failed to prove their prima facie case. That said, the Court notes that application of the *Mt. Healthy* standard appears to be the majority rule. *See Davison, supra.*

6. There are two reasons for that. First, the plaintiffs' pleadings and briefing rely on both lines of authority. *Compare, O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996); *Altonen v. City of Minneapolis,* 487 F.3d 554 (8th Cir.2007). Second, it is not clear from the record what, precisely, the plaintiffs *did* to support Dorcey—in other words, whether they were simply known to support him (akin to political affiliation) or whether they engaged in campaign activities on his behalf (exercising free speech rights).

*acceptable* basis for termination. *See, O'Hare Truck Service, supra; Hinshaw v. Smith,* 436 F.3d 997 (8th Cir.2006). The defendants in this case do not attempt to justify the plaintiffs' termination on that basis, and it is only implicated *after* the plaintiffs' prima facie case is established.

In addition, it is not disputed that the plaintiffs suffered an adverse employment action. So, the only issue with respect to establishing the prima facie case is whether the plaintiffs have presented sufficient evidence that their protected association and speech activities were a substantial or motivating factor in the decisions to terminate them. *See Davison, supra.*

The difficulty that the plaintiffs face in establishing their prima facie case is that their evidence is primarily hearsay. Much of the evidence relied upon by the plaintiffs consists of statements made by Vance, and they are out-of-court statements whose relevance depends on the truth of the matter asserted in the statements. *See* Fed.R.Evid. 801(c). The Court can find no hearsay exception that applies. *See* Fed.R.Evid. 803, 804, and 807.

Nor do Vance's alleged statements fit within the definitional exclusions of Fed.R.Evid. 801(d). If Vance was called to testify at trial, and testified in accord with his affidavit (as must be assumed), then any prior inconsistent statements could be used for impeachment, but they were not given under penalty of perjury at a prior proceeding. *See* Fed.R.Evid. 801(d)(1)(A). So, while the statements could be used for impeachment, they are not admissible as substantive evidence. *See,* Fed.R.Evid. 613(b); *Thien, supra.* A jury would have to be instructed not to consider Vance's out-of-court statements as evidence of material facts. *See Thien, supra.* So, those statements cannot help the plaintiffs prove their prima facie case. *See id.*

The closest that Vance's out-of-court statements come to admissibility is

through Fed.R.Evid. 801(d)(2)(D). Vance, while not a party-opponent, was an agent or employee of a party-opponent. But Rule 801(d)(2)(D) also requires that the statements be made "on a matter within the scope of that relationship." In other words, party admissions must concern a matter within the scope of employment of the person making the statement. *E.E.O.C. v. Con–Way Freight, Inc.,* 622 F.3d 933 (8th Cir.2010); *see, also, Ahlberg v. Chrysler Corp.,* 481 F.3d 630 (8th Cir. 2007). There is no basis here to conclude that Vance's out-of-court statements concerned a matter within the scope of his duties as a deputy sheriff. *Compare, Con–Way Freight, supra; Ahlberg, supra; Tallarico v. Trans World Airlines, Inc.,* 881 F.2d 566 (8th Cir.1989). In fact, given that the plaintiffs' evidence would show Vance as attempting to hide his activity from Yocum, the only reasonable conclusion is that Vance's activity was *not* within the scope of his employment.

Absent Vance's statements, what other evidence do the plaintiffs have? The statement Hejl supposedly made to Vance, warning that Dorsey supporters would be fired, was overheard by Muhm. And Hejl is, for the moment, a party-opponent. *See* Rule 801(d)(2)(A). But Hejl's alleged remark does not help the plaintiffs for two reasons. First, as will be explained below, the Court finds that Hejl is entitled to summary judgment for another reason— meaning that after he is dismissed from the case, his statement suffers from the same evidentiary defects as Vance's. Second, even assuming that Hejl made the statement and it is admissible, there is nothing in the record to show why Hejl would have thought that Dorcey supporters would be fired. Nor, given that Hejl denies making the statement, would there likely be evidence on that point at trial. So, that begs the question: how would Hejl's out-of-court statement—or his al-

leged participation in intimidation of citizens—tend to prove that the plaintiffs' protected speech was a substantial or motivating factor in Yocum's decision to fire the plaintiffs? *See, Rynders, supra; Davison, supra.* Even viewing the evidence in the light most favorable to the plaintiffs, *see Torgerson, supra,* the connection to Yocum would rest on speculation, not an inference from the evidence. *Cf. Copsey v. Swearingen,* 36 F.3d 1336 (5th Cir.1994).

■ A substantial or motivating factor can be proven through either direct or indirect evidence, *see Wagner, supra,* and the plaintiffs also base their argument on indirect evidence—they point to the timing of the firings and assert that every deputy who supported Dorcey was fired after the election. Muhm's affidavit identifies five such deputies—Schaefer, Muhm, Blath, and two others—although one of the others was an unpaid reserve. (Filings 47–1 at 1 and 52–1 at 1.) Yocum presented evidence explaining each of those terminations, and also presented evidence that other employees (although not necessarily deputies) were known supporters of Dorcey and were not disciplined or terminated. (Filings 36–1 at 82 and 52–1 at 1). The timing of the firings is not particularly probative—a coincidence of timing is rarely sufficient to establish a submissible case of retaliatory discharge, *see Kipp v. Missouri Highway and Transp. Com'n,* 280 F.3d 893 (8th Cir.2002), and there was actually at least a 2–month delay between the protected activity and the terminations, diluting any inference of causation. *See Altonen, supra.* While Yocum's new term had just begun when the plaintiffs were terminated, there is no apparent reason why they could not have been fired at any time before or after the election, if their electoral participation was really the basis for the firings.

The Court also notes the conflicting evidence regarding Yocum's stated reasons for discharging the plaintiffs. For the most part, the Court need not consider this evidence because it would primarily be relevant to whether the plaintiffs would still have been discharged in the absence of their electoral activity—an issue into which the Court need not inquire in the absence of evidence establishing the plaintiffs' prima facie case. But it may be possible, in some cases, that an obvious pretext for an employment action could serve as evidence of a retaliatory motive in the first instance. *Cf. Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). While there is conflicting evidence regarding the Jones incident in this case, the evidence, however, as set forth above, is not (even taken in the light most favorable to the plaintiffs) so one-sided as to serve as proof of retaliation.

In short, while there is at least a scintilla of evidence in support of the plaintiffs' position, the plaintiffs' *admissible* evidence would be insufficient to support a conclusion that their electoral activity was a substantial or motivating factor in their termination. While the Court recognizes the difficult position that the plaintiffs are in as a result of Vance's denial of his out-of-court statements, the rules of evidence remain what they are, and they preclude admission of nearly all of the plaintiffs' most persuasive evidence. As a result, the plaintiffs are unable to prove their prima facie case.

### 3. HEJL'S LIABILITY FOR PLAINTIFFS' TERMINATIONS

■ As suggested above, there is an independent basis for concluding that Hejl is entitled to summary judgment: simply put, he didn't fire the plaintiffs. Yocum did. Hejl might have been Yocum's subordinate, and may even have helped Yocum carry out the termination, but there is no evidence of that, nor is there evidence that Hejl was actually involved in the *decision*

to terminate the plaintiffs. *See Copsey, supra.* The plaintiffs correctly note that a supervisor may be held liable for a subordinate's actions based upon deliberate indifference toward a constitutional violation, *see e.g. Choate v. Lockhart,* 7 F.3d 1370 (8th Cir.1993), but that does not mean that a subordinate can be held liable for what was, undisputedly, a supervisor's decision. *See Copsey, supra.*

In short, the damages alleged in this case flow from the plaintiffs' termination, for which Hejl was not responsible. Hejl is entitled to summary judgment on that basis as well.

### 4. DELIBERATE INDIFFERENCE

The plaintiffs also seem to suggest that Yocum can be held liable based on his alleged deliberate indifference to constitutional violations committed by his subordinates—for instance, the alleged harassment of citizens by Hejl and Nantkes. But the complaint filed in this case does not allege damages arising from, for instance, a hostile workplace environment. *Compare, e.g., Ottman v. City of Independence, Mo.,* 341 F.3d 751 (8th Cir.2003). Even if the evidence of such activities is admissible—questionable, as discussed above—this has been consistently framed as a case of retaliatory discharge, or perhaps patronage dismissal, and the damages alleged flow from the firings. There is no indication that Hejl, Nantkes, or Vance—or, for that matter anyone other than Yocum—participated in the decision to terminate the plaintiffs. Yocum's alleged indifference to his subordinates' activities does not support the claims actually alleged in the plaintiffs' operative complaint.

### 5. DEFENDANTS' OFFICIAL CAPACITIES

■ Yocum also contends that he is entitled to summary judgment in his official capacity because there is no evidence that a municipal policy or custom caused a violation of the plaintiffs' constitutional rights.

A suit against Yocum in his official capacity is, in effect, a suit against Seward County, and Seward County can only be held liable if there is evidence of a policy, officially adopted or promulgated by Seward County, or a practice, so permanent and well settled as to constitute a custom, that existed and through which Yocum fired the plaintiffs. *See Davison, supra; see, also, Rynders, supra.* There is no such evidence. And although an unconstitutional government policy can in some instances be inferred from a single decision made by the highest officials responsible for setting policy in that area of the government's business, final *policymaking* authority is different from final *decisionmaking* authority. *See, Rynders, supra; Davison, supra.* As the U.S. Supreme Court explained in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 n. 12, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986),

> for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.

(Emphasis in original.)

In this case, Yocum argues that the Seward County Board, not the sheriff, has

the final say in county employment policy. The plaintiffs do not contend otherwise, and in fact did not respond to that aspect of the defendants' summary judgment argument. Therefore, the Court concludes that Yocum is also entitled to summary judgment, with respect to his official capacity as sheriff of Seward County, on this basis.[7]

### 6. 43 U.S.C. § 1981

Nor did the plaintiffs respond to the defendants' argument that they were entitled to summary judgment with respect to the plaintiffs' 42 U.S.C. § 1981 claim. The defendants contend, correctly, that an allegation of racial discrimination is necessary to state a claim under § 1981. *See, Landrigan v. City of Warwick,* 628 F.2d 736 (1st Cir.1980); *Olivares v. Martin,* 555 F.2d 1192 (5th Cir.1977); *Risley v. Hawk,* 918 F.Supp. 18 (D.D.C.1996); *see, also, Gratz v. Bollinger,* 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003); *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). The Court finds that the defendants are also entitled to summary judgment with respect to the plaintiffs' § 1981 claim on this basis.

### 7. QUALIFIED IMMUNITY

Finally, the Court notes that in light of its conclusion that the plaintiffs failed to prove a constitutional violation, it is unnecessary to discuss the defendants' claim of qualified immunity. But the Court is mindful of its responsibility, in such cases, to clearly articulate its analysis. *See e.g., Jones v. McNeese,* 675 F.3d 1158 (8th Cir. 2012); *Heartland Acad. Cmty. Church v. Waddle,* 595 F.3d 798 (8th Cir.2010). Whether a government official is entitled to qualified immunity involves two inquiries: (1) whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right, and (2) whether the relevant constitutional right was clearly established at the time of the alleged violation. *Waddle, supra.* Showing that the right is clearly established in the abstract is not enough, however; a particularized showing must be made that a reasonable officer would understand that what he is doing violates that right. *Shockency, supra.*

Because the Court has found that the plaintiffs did not establish a violation of a constitutional right, it is not necessary for the Court to determine whether such a right was clearly established. The Court notes, however, that the defendants have threaded qualified immunity standards throughout their argument, even while denying that a constitutional violation occurred. For the sake of completeness, the Court notes that it is clearly established that sheriff's deputies are free to speak on matters of public concern without fearing adverse employment actions. *See id.* Nor does the Court see any basis for concluding that a reasonable officer would not understand that firing a deputy for supporting a political candidate would violate that right. *See id.; see, also, Altonen, supra.*

As a result, qualified immunity is not involved in this case. The defendants either did what they are alleged to have done, or they didn't—but if they did what they are alleged to have done, such actions would violate clearly established rights, and a reasonable officer would know that. This case turns on the evidence of a constitutional violation, one way or the other,

---

7. There is some ambiguity in the pleadings and record as to whether Hejl was also sued in his official capacity. Based on the caption, which only names Yocum in his official capacity, the Court has limited its discussion to Yocum. However, to the extent that Hejl might also have been named in an official capacity, the Court notes that its reasoning with respect to Hejl would be the same—and, in fact, stronger, because there is even less basis for concluding that Hejl had policymaking authority.

and qualified immunity does not enter into it. Because the Court finds the evidence of a constitutional violation to be lacking, the defendants are entitled to judgment as a matter of law.

### III.  CONCLUSION

In sum, the defendants are entitled to summary judgment because the evidence, even taken in the light most favorable to the plaintiffs, is insufficient to support a conclusion that the plaintiffs' exercise of their First Amendment rights was a substantial or motivating factor in Yocum's decision to fire them. In addition, Hejl is entitled to summary judgment because he was not responsible for firing the plaintiffs, Yocum is entitled to summary judgment in his official capacity because there is no basis for holding Seward County liable, and the plaintiffs' § 1981 claim fails in the absence of an allegation of racial discrimination. Accordingly,

IT IS ORDERED that:

1. The defendants' motion for summary judgment (filing *35)* is granted in all respects.

2. A separate Judgment will be entered.