# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3645
_____

Melvin Smith

*Plaintiff - Appellant*

v.

URS Corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: September 11, 2014
Filed: October 14, 2015

_____

Before BENTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Melvin Smith sued his employer, URS Corporation, alleging retaliation and race discrimination in violation of 42 U.S.C. § 1981 and § 2000e-2. The district court granted summary judgment in favor of URS. We reverse.

## I. Background

The United States Army hired contractor URS to destroy munitions at a facility in Arkansas. Smith, a black male, applied to work for URS as an instructor/trainer for employees on the Arkansas project. At the time of his application, he understood he was applying for full-time employment on a project of temporary duration.

Smith received a position with URS in November 2007. The parties agree Smith sought the position of "Training Specialist" and a salary of $46,000. URS hired him with the "Working Title" "Training Specialist" and the "Classification Title and Job Code" "Senior Training Specialist (65010)." URS employed a salary scale in which employees were assigned "grades" that corresponded with a salary range. URS hired Smith at grade S5.12 with a salary of $57,668 per year.[1]

Five months later, URS hired a white applicant named Jesse Griffin. Griffin stated on his written application that he sought the position of "Training Specialist." Griffin sought a salary of $65,000. A URS human resources employee, Erika Hadley, extended an offer to Griffin as an S5.12 "Training Specialist." When Griffin commenced employment with URS, however, he was assigned grade S5.13 with the "Working Title" "Sr. Training Specialist," the "Classification Title and Job Code" "Staff Training Specialist (65010)," and a salary of $65,000 per year.

Two months after URS hired Griffin, it hired a black male applicant, Stanley Ellis (now Dr. Ellis). Ellis had applied for the position of "Training Specialist" seeking a salary of "$58K-65K." He was hired with the  "Working Title" "Training

---

[1] Records provided to the court use multiple titles for employees' positions, but the parties do not explain the meanings of these titles. We present in detail the salaries sought, positions received, and multiple titles applied to several different employees.

Specialist," the "Classification Title and Job Code" "Sr. Training Specialist (65010)," and a salary grade of S5.12. Like Smith, Ellis received an annual salary of $57,668.

At the time of hire, Ellis possessed a master's degree and was working towards a Ph.D. Smith and Griffin both possessed bachelor's degrees. Smith, Griffin, and Ellis all had extensive experience.

Four other trainers already worked for URS on the Arkansas project. These other trainers, all men, were hired between 2001 and 2003. Three were white and one was hispanic. All of these earlier-hired trainers held high school diplomas, three of the four had bachelor's degrees, and none of them had a master's degree or a Ph.D. All four of these men held the "Working Title" "Sr. Training Specialist" at grade S5.13 and earned a higher wage than Smith and Ellis. One of the earlier-hired trainers earned less than Griffin.

Written descriptions for the S5.12 and S5.13 positions listed duties in mostly identical terms. For certain duties, the wording differed slightly in ways that seem inconsequential. For example, the written description for the S5.12 position stated, "revise course materials as required due to engineering, regulatory or operational changes and updates," and the description for the S5.13 position stated, "rewrite and revise course materials as required due to engineering or operational changes and updates." Differences that may have been consequential were as follows. The S5.12 position description listed, "facilitate vendor- and subcontractor-provided training," but the S5.13 position had no corresponding duty. And the S5.13 position description listed "train other trainers" and "prepare course schedule" with no corresponding duties for the S5.12 position. The written descriptions for both positions expressly noted that no supervisory duties were required.

Smith admits that at the time URS hired him, he did not suspect racial discrimination—he received the job for which he applied at a rate of pay higher than

he requested. He also had no knowledge at the time of hire regarding the titles, salaries, and grades assigned to the earlier-hired trainers. Finally, he did not immediately learn of Ellis's or Griffin's terms of employment.

At some time after URS hired Ellis, Smith became aware that Griffin had been hired at a higher grade and higher rate of pay than both Smith and Ellis. Smith alleges that because URS hired Smith, Griffin, and Ellis all over a period of months, but paid Griffin—the only white man among the three hires—a higher salary than the two black men for doing essentially the same work, racial discrimination reasonably could be inferred as the explanation for the disparity.

Like Smith, Ellis indicated that he did not suspect racial discrimination at the time of his own hire. Ellis stated, however, that the assignment of grades and salaries (and the eventual order of termination for the three men, as described below) looked suspicious and discriminatory in retrospect. When asked about the differences between the S5.12 and S5.13 positions and about the men's actual duties, Ellis stated that Griffin did not perform duties different from Ellis and Smith other than the fact that they taught different classes. Ellis indicated that as the time drew near for closure, Smith and Ellis were teaching full loads whereas Griffin had a light teaching load.

In 2009, Smith complained to Training Manager Ted Howard and asked for a promotion to S5.13. Howard responded that the client (who in this case was the United States Army) "might frown at that." Smith also complained to a lower-level shift supervisor, Charles Smith (no relation), who told Smith he was doing a good job and should ask Howard for a promotion. Smith relayed Charles Smith's opinion to Howard. Charles Smith later reported that Howard told Charles Smith "not to encourage" Smith. Charles Smith described Howard's response as Howard "jumping all over" him.

Eventually, the URS project in Arkansas matured to a point where URS needed to switch from an ongoing, operational phase of activity towards a final project-termination or shut-down phase. URS asserts the anticipated ending of the project and the switch to a final phase required changes in job duties for URS workers and changes in the courses taught by training staff. URS also began preparations for a series of reductions in force (RIF).

Howard conducted a subjective ranking of the trainers and ranked Smith and Ellis lowest among all seven trainers, thus placing them first in line to be terminated during a RIF. Howard ranked Griffin highest. Smith points out, and Ellis's deposition testimony confirms, that Howard assigned these rankings notwithstanding the fact that Griffin and another trainer had disciplinary reports in their personnel files. Specifically, Griffin was disciplined for distributing purportedly obscene material in a class. The other trainer—who was ranked lower than Griffin but higher than Smith and Ellis—had a disciplinary report for claiming expenses from URS for a training trip but not attending training. Finally, Smith and Ellis testified that Griffin had openly conducted a side-business of selling health drinks from his office space at URS on company time without being disciplined.

URS asserts Howard's subjective ranking reflected, in part, the different trainers' relative abilities to teach courses that would be needed during the shut-down phase of the project. URS, however, points to no evidence tending to suggest how Howard made determinations regarding the trainers' relative abilities. And Ellis testified in his deposition that, at the end of Smith's employment, Ellis and Smith were still teaching courses. Ellis testified that Griffin, on the other hand, would go "a week or two weeks" without teaching a course.[2]

_____

[2] URS did submit to our court a table purportedly listing the courses being taught by the different trainers prior to the shut-down phase. The table, however, is illegible due to the shading of boxes and, as such, does not convey what courses were taught. A legible section of the table indicates Ellis and Smith were qualified to teach

-5-

After employees were made aware of the rankings and the likely order for their terminations in the RIFs, Smith renewed his complaint about his salary and grade assignment. This time, he sent an email to human resources employee Erika Hadley and met with Hadley and another human resources employee. Smith also asked Howard about the ranking process. Howard denied having been responsible for the rankings and told Smith human resources made the decisions. In the present litigation, URS admits Howard conducted the rankings.

Although Smith was scheduled to be the first trainer terminated during an initial RIF, a different trainer voluntarily left employment for other reasons. This departure allowed Smith to continue working. Eventually, during a subsequent round of terminations pursuant to the RIF, URS terminated Smith's employment. Smith was the first trainer involuntarily terminated under the RIF.

Smith sued, alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981. Smith identified the discrepancy in pay and grade between Griffin, Ellis, and Smith as discriminatory treatment in the terms and conditions of employment. He also identified subsequent actions, including the subjective ranking and order of termination, as discriminatory and retaliatory. Finally, he identified his own request for higher pay and his report to Howard of a pay and grade discrepancy as a protected act that triggered retaliation. Smith alleged he should have been paid at a higher rate while employed by URS and should have continued his employment until a later-stage RIF. Specifically, he alleged he should have remained employed at least until the later date at which URS terminated Griffin's employment. The parties conducted discovery, and URS moved for summary judgment.

---

fewer closure-related courses. Again, however, there is no indication as to how Howard reached the conclusion that Ellis and Smith were less qualified than other trainers to teach closure-related courses.

URS's primary argument addressed the question of whether Smith established a prima facie case. URS argued simply that, because Smith received the job for which he applied at a rate of pay above what he sought, he could not make out a prima facie case of discrimination. Regarding the initial salary and job assignments for Smith, Griffin, and Ellis, URS also argued that Griffin had more management experience than Smith or Ellis. Regarding the RIF rankings and order of terminations, URS argued the rankings were based on objective criteria and the trainers' relative abilities to teach closure-related courses.

The district court analyzed the claims applying the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In doing so, the district court held Smith failed to make out a prima facie case of discrimination, stating:

> Here, Smith alleges disparate treatment in hiring because he applied for an S5.12 position and was awarded an S5.12 position, while Griffin applied for an S5.12 position and was awarded an S5.13 position. The undisputed fact remains, however, that Smith received the position for which he applied. This is not a case where two candidates competed for the same position and one was chosen due to race. As Smith has no other facts supporting unlawful discrimination, summary judgment is granted as to his disparate treatment claim.

The court did not address the remaining steps of the burden-shifting analysis for the discrimination claim and did not analyze the retaliation claim independently from the discrimination claim.

## II. Discussion

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences from that evidence in favor of the nonmoving party. See Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir. 2014).

## A. Discrimination

The parties agree Smith lacks direct evidence of discrimination, and therefore, we must analyze the present claims by applying the three-part, burden-shifting framework of McDonnell Douglas, 411 U.S. at 802–04. Pursuant to this burden-shifting framework, Smith bears the initial burden of establishing a prima facie case. Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc). If Smith establishes a prima facie case, the burden then shifts to URS to articulate a nondiscriminatory reason—a legitimate rationale—for its contested actions. Id. Smith must then "produce evidence sufficient to create a genuine issue of material fact regarding whether [URS's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." Id. (quoting Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)). The burden to prove pretext "merges with the ultimate burden of persuading the court that [Smith was] the victim of intentional discrimination." Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

The district court, as quoted above, analyzed the prima facie case for the discrimination claim as a failure-to-hire claim. In that context, we have said a plaintiff must show "(1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position; and (4) the [employer] filled the position with a person not in the same protected class." Torgerson, 643 F.3d at 1046 (quoting Dixon v. Pulaski Cty. Special Sch. Dist., 578 F.3d 862, 867–68 (8th Cir. 2009)). Smith's complaint, however, did not allege that URS failed to hire him; Smith alleged disparate treatment based on the fact that he, Griffin, and Ellis all applied to work as Training Specialists but that Griffin was assigned a higher position with pay grade S5.13 whereas Smith and Ellis were hired as Training Specialists and assigned pay grade S5.12. We have described the elements of a prima facie case in the specific context of a § 1981 disparate treatment claim based on allegedly discriminatory pay differentials:

To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.

Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008); see also Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010) (describing the final element of the prima facie case more generally, "the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)").[3] Applying this framework, we find summary judgment inappropriate.

As a preliminary matter, we note the district court applied the wrong legal analysis. This is not a failure-to-hire case, and the fact the employee was given the job he applied for does not mean he cannot make a disparate treatment claim. The simple fact that a black man was awarded the job he applied for does not justify an employer treating similarly situated employees differently based upon their race. However, since we can affirm on any basis, and URS has argued the summary judgment record does not support the disparate treatment claim, we will analyze whether Smith's claim for disparate treatment can survive summary judgment. See Keefe v. City of Minneapolis, 785 F.3d 1216, 1222 (8th Cir. 2015) (noting that we may affirm a grant of summary judgment on any grounds supported by the record).

---

[3]According to Tademe v. Saint Cloud State University, 328 F.3d 982 (8th Cir. 2003), cited by the dissent, in order to establish a prima facie case of salary discrimination based on race, a plaintiff must show the employer "paid different wages to employees of different races for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Tademe, 328 F.3d at 989.

Taken in a light most favorable to Smith, the summary judgment record shows two black men applied for positions and received the positions for which they applied, one at a salary higher than requested, and one at a salary lower than requested. Between the hiring of these two men, a white man without meaningfully different qualifications applied for a position in the same department to perform the same work and received a higher-ranking and higher-paying position than the black men (a position, in fact, higher-ranking than the position for which he had applied). When the first black applicant discovered the differences in title and pay, he asked for a raise and was told by a supervisor that the client—the United States Army—"might frown at that." That same supervisor chided a lower-level supervisor for supporting the first black applicant and told the lower-level supervisor not to encourage the black man. Later, when it came time to rank the employees for order of termination during a RIF, the supervisor ranked the two black men lowest among the department's employees using his subjective views of the employees. And, in conducting the subjective ranking, the supervisor overlooked disciplinary matters in the files of the non-black trainers whom he ranked higher than the two black trainers. Finally, the supervisor falsely denied involvement with the ranking process when the first black man asked for an explanation.

The plaintiff's burden at the prima facie stage is not great; the plaintiff is required to present facts capable of supporting an inference of discrimination. Torgerson, 643 F.3d at 1047 ("The burden of establishing a prima facie case of disparate treatment is not onerous." (quoting Burdine, 450 U.S. at 253)). In attempting to present facts that would support such an inference, the test for whether employees are similarly situated is strict; the employees must be "similarly situated in all material respects." See Onyiah v. St. Cloud State Univ., 684 F.3d 711, 717 (8th Cir. 2012) (quoting Torgerson, 643 F.3d at 1051).

URS argues Griffin received higher pay and a different title because Griffin performed different duties than Smith, URS believed Griffin to have greater

management experience than Smith, and Griffin applied for a different job than Smith. It is unclear whether URS's arguments are directed towards challenging the assertion that Smith and Griffin were "similarly situated" or whether the arguments are offered to present a legitimate rationale for URS's actions. Regardless, to the extent URS argues Smith and Griffin were not similarly situated, we reject URS's argument.

Regarding the men's duties, qualifications, and URS's view of their qualifications, a plaintiff is not required at the prima facie stage to prove his "*relative qualifications*" for a benefit. See Torgerson, 643 F.3d at 1047. Even if such proof were required at this stage, however, a question of fact would exist as to whether the men were similarly situated. Smith and Ellis both testified that all three men performed the same duties. The men worked under the same supervisors, and the formal, written job descriptions contained in the record show the positions have materially similar duties. Further, while we do not suggest the men's past experience is identical, and we acknowledge some differences in the written job descriptions (if not in the actual duties performed), URS has not explained how any differences that may exist are material. URS asserts that Griffin had more management experience without explaining the nature of this experience or its relevance to the training positions. In this regard, we emphasize that the written descriptions for both the S5.12 and S5.13 positions expressly note the positions include no supervisory duties.

We also note the briefs and summary judgment record in this regard are extremely confusing. URS has not explained to the court the distinctions it uses for the multiple titles attached to each employee and position. The parties also use "classification titles" and "working titles" interchangeably and without explanation in their arguments. In construing the record in the light most favorable to the plaintiff, we cannot find in favor of URS on these important distinctions. Secondly, the record is very confusing as to the argument URS makes that Smith and Ellis sought employment as "Training Specialists" while Griffin responded to a posting and

applied for a position as "Senior Training Specialist" at S5.13 pay grade. In support of this argument, URS provides citations to the Appendix, but those citations do not support the argument. The citation for the proposition that Griffin applied for a posting of a Senior Training Specialist is App. 30, 239–40. App. 239–40 is the URS notice of a new hire. It does indicate that Griffin is being hired as classification title, "Staff Training Specialist," and working title, "Sr. Training Specialist at grade S5.13." However, it says nothing about the job posting, what Griffin applied for, or the salary he requested. The citation to App. 30 is a page from Melvin Smith's deposition in which Smith was asked if he had any knowledge as to whether Griffin applied for the Senior Training Specialist position. Smith responded "No." URS does not cite to the actual application filed by Griffin, which is found at App. 251, in which Griffin is shown to be applying for the position of "Training Specialist," not "Senior Training Specialist." In short, the record, as presented to this court, does not support the argument that the three individuals in question, Smith, Griffin, and Ellis applied for different positions at URS. Rather, the record shows they applied for the same position but were awarded different positions at different salaries.

As to the second and third stages of the burden-shifting analysis, URS appears to assert the same arguments about the men's applications, qualifications, and duties as nondiscriminatory reasons for its differential treatment. These arguments, and additional facts and arguments, lead us to conclude summary judgment is inappropriate. For example, it remains unclear why Griffin's pay grade switched from S5.12 (in his initial hiring letter from Erika Hadley) to S5.13 (at his actual commencement of employment). This nuance to the case—the fact that the letter initially offering him employment listed the S5.12 pay grade—is inconsistent with URS's insistence that Griffin applied exclusively for an S5.13 position. The Hadley letter, therefore, lends further support to Smith's claim that the men applied for the same position.

Regarding URS's purported belief that Griffin was more qualified than Smith and Ellis, URS has not explained with any detail the source of any such belief.[4] The men's backgrounds are not identical, but it is not evident from the face of any cited materials why differences in their backgrounds would cause URS to view Griffin as more qualified than Smith or Ellis. And, although an employer's reasonable but mistaken belief as to a person's qualifications, conduct, or misconduct may serve as a legitimate rationale capable of defeating an allegation of discrimination, see, e.g., Richey v. City of Independence, 540 F.3d 779, 784 (8th Cir. 2008), any such belief must be material to the actual decision at issue. Here, URS did not explain the relevancy of any differences in background for the positions involved. Given that neither the S5.12 nor the S5.13 position carried supervisory duties, a reasonable jury could view URS's assertion that it hired Griffin at a higher level based on purportedly superior management experience as a false, after-the-fact explanation for its actions. See Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1124 (8th Cir. 2006).

Similarly, there is other evidence of dissembling in this case that a jury could rely upon to discount URS's claimed rationales for its actions. For example, a jury could view Howard's false denial of involvement with the ranking process, when coupled with his seemingly defensive reaction to Smith and Charles Smith, as evidence of a desire to hide an impermissible motive. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); Ridout v. JBS USA, LLC, 716

---

[4]The dissent believes that this court must find that Smith was more qualified than Griffin to support an inference of pretext by URS. See Torgerson, 643 F.3d at 1048. However, unlike the plaintiffs in Torgerson, Smith does not claim as evidence of pretext that he is more qualified than Griffin. See id., at 1047-49. He points to other facts that could lead to a conclusion that URS's justifications are pretextual. See Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (explaining that "qualifications evidence may suffice, at least in some circumstances, to show pretext").

-13-

F.3d 1079, 1086–87 (8th Cir. 2013) ("Demonstrating that [an employer's] reasons are unworthy of credence would support a finding of . . . discrimination[.]" (internal quotation marks omitted)). In this regard, we note URS challenges neither the assertion that Howard falsely denied involvement with the ranking process nor the description of Howard's reaction when Smith and Charles Smith lobbied to have Smith promoted.

Finally, URS comes back to its main argument that no discrimination existed because Smith received the position he requested at a higher salary than he sought, and therefore, there can be no discrimination. For the reasons previously stated, this is a disparate treatment claim and we reject this argument. Moreover, even if that argument had any validity as to the initial hire, URS provides no argument as to the continuing pay disparity after Smith did, in fact, ask for a raise. Smith has presented adequate evidence to create a jury question on his disparate treatment discrimination claim.

## B. Retaliation

Smith also alleged in his complaint that the ranking for purposes of the RIF was done in retaliation for his complaints about disparate pay. The district court, however, did not discuss the elements of a retaliation claim. Rather, it appears the district court analyzed the argument concerning the ranking of Smith and Ellis at the bottom of the RIF list as a discrimination claim. That is, the court referenced "a prima facie case of discrimination" and the articulation of a "nondiscriminatory reason" while citing the same alleged racial animus that motivated the disparate pay as the motivating factor in the RIF rankings. Admittedly, the plaintiff's resistance to the motion for summary judgment was less than clear. The resistance did identify the claim as a retaliation claim and did set out the elements of retaliation, including protected activity. However, the resistance also discussed at length the possible discriminatory animus that may have motivated the ranking.

-14-

Because the district court did not discuss the elements of a retaliation claim, we will vacate and remand the denial of the retaliation claim. We believe the district court is better suited to develop the record and address in the first instance the elements of a retaliation claim and whether that claim can survive summary judgment.

We reverse the judgment of the district court.


SHEPHERD, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court. Smith has failed to establish a prima facie case for discrimination because he has not demonstrated that he suffered an adverse employment action, nor do the circumstances give rise to an inference of discrimination from URS's treatment of Smith as compared to Griffin.

Smith received the position for which he applied, and he received a salary which was over $10,000 per year more than he requested. He therefore suffered no adverse employment action in the hiring process. He did not apply for a higher position, nor did URS hire Griffin over Smith. Griffin applied for his job five months after Smith, and Griffin indicated on his employment application that he expected a salary of $65,000, which is the salary of the S5.13 grade position for which Griffin was ultimately hired. Thus, the majority penalizes URS for hiring Griffin at the salary he requested and hiring Smith at more than $10,000 over the salary which he sought. Upon these undisputed facts, no reasonable jury could find that URS unlawfully discriminated against Smith in the hiring process.

Smith also points to the denial of his request for a raise and his early termination date as adverse employment actions. We have held that a decision not to raise an employee's salary does not constitute an adverse employment action where

the employee's salary is not decreased or otherwise diminished in any way. Tademe v. Saint Cloud State Univ., 328 F.3d 982, 992 (8th Cir. 2003). Therefore, Smith's contention that the denial of his request for a raise constitutes an adverse employment action is without merit. Smith's salary was never decreased nor diminished. In fact, it is undisputed that Smith's salary was significantly *higher* than the salary he requested in his job application.

As for Smith's early termination date, when URS began closing down its operations in 2010, it created a destaffing process whereby employees completed tests and were assigned termination dates based on their scores. Griffin scored the highest of all training specialists, while Smith scored the lowest. Consequently, Smith was one of the first employees URS released. Smith makes bare allegations that the test itself was discriminatory, but he provides no evidence that gives credence to this assertion. Smith's low test score provides a legitimate, non-discriminatory reason for his early termination date as compared to Griffin. Moreover, at the time of Smith's hire, URS informed him, as it did all of its employees, that the company had a fixed contract with the government and that it would cease operations upon completion of the contract. Ultimately, URS laid off all of its employees, and the facility is no longer in operation.

Even if Smith could show an adverse employment action, Smith has not shown that the circumstances give rise to an inference of discrimination. "Although evidence of pretext is normally considered at the last step of the McDonnell Douglas analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case." Young v. Builders Steel Co., 754 F.3d 573, 578 (8th Cir. 2013) (citing Lake, 596 F.3d at 874). At the inference-of-discrimination stage, a plaintiff may show pretext by demonstrating that the employer treated similarly-situated employees in a disparate manner, as Smith attempts to do here. Lake, 596 F.3d at 874. Smith argues that he was similarly situated to Griffin in all relevant respects; however, the evidence indicates that URS believed Griffin had more classroom and management

experience, and was thus better suited to handle a larger range of classes than Smith. While a plaintiff does not have to prove his relative qualifications to meet his prima facie burden, he does have to show that he is similarly situated. We have held that two co-workers were not similarly situated when one co-worker was unable to perform the job responsibilities of the other. See Young, 754 F.3d at 578. Here, Smith has presented scant evidence that he could have handled as large a range of classes as Griffin. Therefore, in one highly relevant respect, Smith has failed to meet his burden to demonstrate that he is similarly situated to Griffin.

The majority devotes much of its opinion to scrutinizing the nondiscriminatory justifications articulated by URS. Yet, URS's burden is "not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Torgerson, 643 F.3d at 1047 (quoting Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999)). URS has consistently maintained that Griffin asked for a higher salary and was more qualified than Smith. "Where . . . the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." Torgerson, 643 F.3d at 1048 (citation omitted). We have determined that "[i]f the comparison 'reveals that the plaintiff was only similarly situated or not as qualified as the selected candidate,' then no inference of . . . discrimination would arise." Id. at 1049 (quoting Wingate v. Gage Cnty. Sch. Dist., 528 F.3d 1074, 1080 (8th Cir. 2008)). At most, Plaintiff has shown that his qualifications are similar to Griffin. Therefore, Smith's disparate treatment claim must fail.

With regard to Smith's retaliation claim, Smith claims that URS retaliated against him for questioning his S5.12 status, however, Smith first complained to his supervisors about his treatment in 2009 and he was not laid off until 2011. Moreover, URS articulated a non-retaliatory reason for Smith's termination: he scored the lowest

on the destaffing tests.  Further, at the time URS hired Smith, URS informed him that the facility would shut down at some point in the foreseeable future.  URS eventually laid off every employee, and the order of termination was assigned by test score, with the lowest-scoring employees receiving the earliest termination dates.  Given these facts, Smith has not demonstrated that URS retaliated against him for complaining about his S5.12 position.

Accordingly, I would affirm the district court's grant of summary judgment in favor of URS.

_____