# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3723

_____

Charles D. Cullor

*Plaintiff - Appellant*

v.

John Baldwin; Harbons Deol; Sheryl Lockwood-Dahm; Nick Ludwick; Rebecca
Bowker; Dave DeGrange; Mark Larson; Stephanie Cooper; Grant Abernathy;
Monica Nye

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: February 10, 2016
Filed: August 1, 2016

_____

Before SMITH and COLLOTON, Circuit Judges, and ERICKSON,[1] District
Judge.

_____

SMITH, Circuit Judge.

---

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court
for the District of North Dakota, sitting by designation.

Charles Cullor, an Iowa prison inmate, brought suit against, among others, John Baldwin, Director of the Iowa Department of Corrections (IDOC), and Dr. Harbons Deol, Medical Director of the IDOC, under 42 U.S.C. § 1983 for deliberate indifference to his serious medical need, in violation of the Eighth Amendment. Specifically, Cullor alleged that Director Baldwin and Dr. Deol were deliberately indifferent to his need for dentures. Cullor sought declaratory and injunctive relief, as well as compensatory and punitive damages. Director Baldwin and Dr. Deol moved for summary judgment, which the district court[2] granted. Cullor now appeals, and we affirm.

## I. *Background*

"We recite the facts from the record in the light most favorable to [Cullor], the nonmovant in this summary judgment disposition." *PPS, Inc. v. Faulkner Cty., Ark.*, 630 F.3d 1098, 1100 (8th Cir. 2011) (citation omitted).[3]

Cullor has lived at the Iowa State Penitentiary (ISP) since October 1980. While at the ISP, he has received regular dental checkups. Cullor has a history of significant tooth decay. During Cullor's time at the ISP, prison dentists have extracted several of his teeth. On October 13, 2010, Cullor had his remaining teeth extracted at the University of Iowa.

The ISP ranks inmates' dental needs based on medical necessity. At the ISP, only the staff dentist is authorized to place an inmate on the Denture List based on the dentist's determination that the inmate needs a partial plate or complete dentures. To qualify for placement on the Denture List, an inmate must have fewer than eight

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

[3]In his brief, Cullor adopts as his own the magistrate judge's recitation of the facts in her report and recommendation to the district court.

posterior teeth in contact or be missing three posterior teeth in a row. This standard is consistent with the Iowa Medicaid standard, which provides that patients may qualify for dentures if they are missing any three adjacent teeth.[4]

Dental records submitted in this case date back to an examination on July 28, 2005; at that time, Cullor was missing 11 teeth. The chart note for that examination indicates "Needs Denture: No." (Bold omitted.) As of August 3, 2005, Cullor qualified for placement on the Denture List because he was missing at least three adjacent posterior teeth[5] and had fewer than eight posterior teeth in contact. As the magistrate judge recognized, "Viewing the record in the light most favorable to Cullor, Dr. [Richard] Snow placed him on the Denture List on August 3, 2005."[6] From August 2006 until November 2009, Cullor received various dental services, including exams, x-rays, fillings, and extractions and associated prescriptions.

[4]As the magistrate judge noted, the Medicaid standard is a public insurance standard that varies by state; for example, the Illinois Medicaid standard provides that a patient must be missing *all* of his or her teeth to qualify for dentures.

[5]Cullor was missing 12 posterior teeth: 3 lower on each side and 3 upper on each side.

[6]It is undisputed that Cullor was placed on the Denture List at the ISP, although the defendants admittedly cannot establish who ordered the placement or when it occurred. The magistrate judge also correctly identified inconsistencies in the chart notes for Cullor that the defendants submitted. For example, chart notes dated July 28, 2005, through November 23, 2009, provide "Needs Denture: No." (Bold omitted.) But a *second* chart note dated November 23, 2009, indicates "Needs Denture: Yes." (Bold omitted.)

Additionally Dr. Snow's chart notes dated August 3, 2005, and August 10, 2006, provide "Needs Denture: No," yet chart notes subsequent to March 23, 2010, contain notations such as (1) "LEAVE ON DENTURE LIST PER DR. SNOW'S DENTAL ENCO[U]NTER 8/3/05 & 8/10/06," and (2) "F/P DR. SNOW 8/3/05—LEAVE THIS NOTE/COMMENT ON HERE. Needs Denture: Yes." (Bold omitted.)

On March 23, 2010, Monica Nye, an ISP dental assistant, performed a review of Cullor's chart, noting that Cullor was to remain on the Denture List per Dr. Snow's directive and was a "Priority II" patient for a complete upper denture and partial lower denture. On August 12, 2010, the ISP's Health Care Unit (HCU) treated Cullor for an oral yeast infection, and a notation was made in his dental chart. Cullor received his annual dental screening on August 17, 2010. The following day, Dr. Mark Larson referred Cullor to the University of Iowa for "[f]ull mouth extractions with IV sedation." Cullor's surgery occurred on October 13, 2010, leaving him "edentulous" (without any teeth). A chart note dated November 1, 2010, indicates that Cullor complained that the kitchen was not providing him with the soft diet prescribed to him following his surgery, and he also requested that his stitches be checked. The following day, Dr. Stephanie Cooper instructed that all of Cullor's "meats need to be ground. Well-cooked vegetables only. Replace fresh fruit with applesauce, canned peaches, or crushed pineapple." Dr. Cooper ordered the "soft diet to assist [Cullor] in getting adequate nutrition and avoid potential issues of choking on food."

The chart note for Cullor's annual dental screening on August 8, 2011, indicates that Cullor needed a complete lower denture, per Dr. Snow's prior directive from August 3, 2005. On August 23, 2011, Cullor sent a kite (written statement) to the ISP dental staff, inquiring when he would receive dentures. In the kite, he made multiple complaints, including being unable to chew effectively, having constant headaches and jaw pain, worsening acid reflux, and having difficulty communicating with others. Cullor connected all of the complaints to his lack of dentures. Nye responded to the kite, explaining that, at the time, the ISP had a dentist on staff one day per week and that she did not know how much time was available to make dentures. She informed Cullor that she would schedule him to see the dentist, but the records do not reflect that any dental personnel examined Cullor regarding this kite.

Cullor filed a grievance in October 2011. In that grievance, he outlined his dental-treatment history; Dr. Snow's recommendation for dentures on August 3, 2005;

the removal of Cullor's remaining teeth in October 2010; and his contention that he had a "serious medical need" for dentures in order to alleviate his pain and constant headaches and that his inability to chew exacerbated his acid reflux. He requested that he immediately receive dentures. On November 2, 2011, Dave DeGrange, an ISP Grievance Officer, contacted Nursing Supervisor Roger Harrison and asked him to review Cullor's grievance. After communicating with Harrison, DeGrange sustained Cullor's grievance. In the grievance response, DeGrange informed Cullor of Harrison's statement that Cullor was "near the top of the list to be seen by the new dentist" for dentures and that "[t]he process requires several appointments, fittings, and adjustments for the issuance of dentures." DeGrange requested that Cullor "be patient" and assured Cullor that he would "be one of the first inmates fitted with new dentures." DeGrange was "unable to provide [Cullor] a definite time frame" but stated that Cullor would "begin the process for fitting dentures in the near future."

On November 14, 2011, Cullor appealed DeGrange's decision and requested "a more definitive answer as to when [he] might get dentures, other than the answer 'your name is near the top of the list.'" Cullor explained that he had received this same answer "for over a year" and "seriously need[ed] relief from the pain." On November 18, 2011, ISP Executive Officer Rebecca Bowker denied the appeal, responding that she was "unable to provide [Cullor] with a definitive date as [he] request[ed] in [his] grievance appeal." She reiterated that Cullor was "near the top of the list and will have some appointments soon to resolve the denture issue." On November 28, 2011, Cullor appealed to the IDOC Central Office. On December 13, 2011, IDOC Assistant Deputy Director Sheryl Lockwood-Dahm denied Cullor's appeal.

On March 19, 2012, Cullor filed a deliberate-indifference claim against, among others,[7] Director Baldwin and Dr. Deol in their official and individual capacities. In

---

[7]In addition to Director Baldwin and Dr. Deol, Cullor also sued Lockwood-Dahm, ISP Warden Nick Ludwick, Bowker, DeGrange, Dr. Larson, Dr. Cooper, Dr. Grant Abernathy, and Nye. The district court granted summary judgment on Cullor's

his complaint, Cullor alleged that Director Baldwin "knowingly and intentionally refused or failed to establish and maintain acceptable standards of dental care for prisoners . . . by failing to insure that adequate and sufficient dentists [were] employed at the ISP." Cullor alleged that Dr. Deol "intentionally and knowingly failed or refused to adequately staff the ISP with sufficient dentists to . . . provide dental services to [him] and the ISP prisoner population." The record reflects that the ISP has employed five dentists since 2009. Dr. Tessa Johnson began serving as ISP's dentist on July 6, 2012. Prior to Dr. Johnson's arrival, the ISP employed several dentists on a part-time basis, including Drs. Larson, Cooper, and Abernathy. As Cullor concedes, "[a]ll of the part-time dentists left ISP voluntarily for non-monetary reasons."[8]

On May 31, 2012, Nye entered the following chart note: "ASK DR. DEOL IF WE SHOULD WAIT TO SEE THIS OFFENDER UNTIL LAW SUIT [SIC] IS SETTLED?" On August 20, 2012, Dr. Johnson, ISP's dentist since July 2012, examined Cullor and began creating impressions for dentures. Final impressions were created on September 17, 2012, and Cullor received complete upper and lower dentures on November 13, 2012. Thereafter, Dr. Johnson made follow-up adjustments to Cullor's dentures.

The testimony before the district court included medical testimony from two physicians, Dr. Stephen Sparks and Dr. Deol, and a dentist, Dr. Johnson. Dr. Sparks, a licensed physician working in the HCU at the ISP, testified that swallowing large chunks of food due to an inability to chew would not tend to exacerbate chronic acid reflux. According to Sparks, patients with esophageal strictures are at a greater risk for choking episodes when unable to chew; however, he explained that this esophageal choking—as opposed to choking in the airway—was distressful but not deadly. Dr. Sparks testified that the ISP medical staff "thought [that Cullor] might have had a

claims against these defendants, and those claims are not at issue in this appeal.

[8]Cullor makes this concession in the background section of his opening brief.

-6-

stricture before 2002." Dr. Sparks admitted that Cullor "was at an increased risk for stricture during that time period." He also testified that complaints of jaw pain are common in edentulous patients and that, as a medical doctor, his recommendation to an edentulous patient experiencing jaw pain would be anti-inflammatory drugs rather than dentures.

Dr. Johnson testified that when she began working at the ISP in July 2012, she worked through the denture list as quickly as possible but noted that she prioritizes patients in need of emergency care. She testified that an ISP dentist has the authority to advance patients on the Denture List, if medical circumstances so warrant, but that "very few circumstances [exist] where that would be." According to Dr. Johnson, in private practice, the ordinary wait time for a patient to receive dentures is two to three months after a dentist's determination that they are appropriate.

Dr. Deol, the IDOC Medical Director and a physician who specializes in internal medicine, testified as to the amount of time that an inmate on the Denture List would have to wait for dentures. He essentially stated that the main focus of the medical personnel is not the passage of time but the medical necessity, which would depend on multiple factors, including others needing dentures and the health and nutritional concerns of the patient.

Cullor acknowledges that while he waited for dentures "the IDOC made efforts to secure additional dental staff specifically for ISP."[9] Dr. Deol and his predecessor, Dr. Edward O'Brien, explored (1) offering programs for retired dentists, (2) targeting new dentists with programs to forgive their student-loan debt in exchange for service at the prisons, and (3) offering part-time work to accommodate schedules of practicing dentists. Dr. Deol testified that "[i]t's a difficult process" "to attract professionals" "in any rural state like [Iowa]." He explained:

---

[9]Cullor concedes this fact in his opening brief.

I'm always recruiting physicians and dentists and psychiatrists on an ongoing basis; and, of course, having to recruit physicians for ISP and dentists is a challenge. And we have not had much success in spite of advertising, in spite of creating some—calling over at the University of Iowa Dental Department, calling to go to the dental fairs, calling dental American Medical Associations to recruit physicians and we have not had much success with those.

Dr. Deol testified that the maximum salary that he could offer a new dentist at the ISP as of November 2012 was $115,000. He admitted that the salary offered was probably a factor in his difficulty hiring dentists but stated that he offered the maximum salary budgeted to new candidates and sought an increase *above* that for dentists with special skills.

Director Baldwin testified that he learned of the long wait for dentures at the ISP in a conversation with the warden and others that occurred between 2008 and 2010. Director Baldwin testified that the discussion over the waiting time for dentures arose in connection with concerns regarding dentist turnover. He stated that the overall conversation was globally focused on medical care at the ISP. Director Baldwin testified that he deferred to medical and dental staff, including Dr. Deol, to determine whether prisoners were receiving acceptable care while the IDOC addressed dentist staffing.

After Cullor filed his deliberate-indifference claim, all of the ISP defendants moved for summary judgment, which the district court granted after adopting the magistrate judge's report and recommendation.[10] As to Cullor's claims against Director Baldwin and Dr. Deol in their individual capacities, the district court concluded that

---

[10]Additionally, as to the claims against all defendants in their official capacities, the district court dismissed the claims for injunctive relief and declaratory relief as moot because Cullor had obtained dentures on November 13, 2012, and failed to introduce evidence showing that he was likely to again need dentures.

Cullor failed to show the existence of a genuine issue of material fact regarding their alleged deliberate indifference to his serious medical need. Specifically, the court found that Cullor failed to submit evidence contradicting Dr. Deol's testimony that he constantly recruits dentists but finds it difficult to employ them at the ISP. The court pointed out Cullor's failure to dispute Dr. Deol's testimony that the dentists who left the ISP while Cullor was on the Denture List did so for non-monetary reasons. The court acknowledged Dr. Deol's admission "that the salary he was authorized to offer new dentists likely impacted his ability to recruit," but it noted Cullor's failure to "dispute that Dr. Deol always offered the maximum salary he was allowed to, and also sought to increase the salary amount for new dentists with special skills." The court concluded that Cullor failed to prove "that he was denied constitutionally required medical care based on cost considerations." The court found nothing in the record beyond mere speculation "to suggest that Dr. Deol deliberately failed to staff an adequate number of dentists at the ISP, or that he could have taken any other measure to generally reduce the Denture List waiting time at ISP, and Cullor's wait in particular."

The court also concluded that no evidence existed that Director Baldwin deliberately failed to staff the ISP with enough dentists, condoned the dentist shortage at the ISP, or attempted to inflict pain or harm on Cullor by limiting the number of dentists at the ISP. The court pointed out that Cullor did not dispute Dr. Deol's testimony that five different dentists worked at the ISP from 2009 to 2012 or that those dentists that left the ISP did so for non-monetary reasons. According to the court, no evidence existed in the record "that Baldwin deliberately failed to take any measures which could have guaranteed that dentists stayed at ISP, or that more dentists could have been employed at ISP before Cullor received his dentures."

## II. *Discussion*

On appeal, Cullor argues that Director Baldwin and Dr. Deol "controlled the purse strings, and created a situation where ISP staff, including the dentists

themselves, simply did not have enough time, or resources to provide dentures, which were medically necessary to reduce [his] mouth pain; to prevent ongoing bouts of choking; and to improve his health." He contends that a genuine issue of material fact remains whether Dr. Deol and Director Baldwin were deliberately indifferent by failing to provide sufficient resources to ensure minimally adequate dental care for inmates such as himself. He maintains that he presented objective medical evidence to show that he had an objective medical need for dentures and that the defendants' failure to address the shortage of dentists subjected him to needless pain.

"We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences from that evidence in favor of the nonmoving party." *Smith v. URS Corp.*, 803 F.3d 964, 968 (8th Cir. 2015) (citation omitted). To determine whether Director Baldwin and Dr. Deol are entitled to qualified immunity, we evaluate

> (1) whether the facts alleged, construed in the light most favorable to [Cullor], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that her actions were unlawful.

*Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015) (quotation and citation omitted). We determine "which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* (quotation and citation omitted).

The Eighth Amendment requires state prison officials to provide inmates with needed medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citation omitted). "To prove deliberate indifference, [Cullor] must show that (1) he suffered from objectively serious medical needs, and (2) the defendants actually knew of, but deliberately disregarded, those needs." *Mead*, 794 F.3d at 936 (citation omitted).

Because Cullor received his dentures on November 13, 2012, "he can only claim deliberate indifference arising from a delay in receiving them." *See Englehart v. Dasovick*, 12 F.3d 1102, 1993 WL 498783, at *1 (8th Cir. 1993) (per curiam) (unpublished table opinion). Because Cullor's deliberate-indifference claim is based on "a delay in medical treatment," we measure "the objective seriousness of the deprivation . . . by reference to the *effect* of delay in treatment." *Laughlin*, 430 F.3d at 929 (quotations and citations omitted). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment . . . [.]'" *Id.* (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)).

We have previously addressed suits against prison officials and medical professionals based on inmates' claims that those persons were deliberately indifferent to the inmates' need for dentures. *See, e.g.*, *Alspach v. Baldwin*, 622 F. App'x 600, 600 (8th Cir. 2015) (unpublished per curiam) (affirming district court's grant of summary judgment to, among others, Director Baldwin and Dr. Deol based on "the unrebutted evidence . . . that neither inmate had an objectively serious medical need for dentures"); *Mead*, 794 F.3d at 937 (holding that nurse and civil commitment unit director were entitled to qualified immunity on civilly-committed sex offender's claim of deliberate indifference based on their refusal to provide him with dentures; offender was never prescribed dentures as a medical necessity, and despite his claims of inability to chew and discomfort, he was still able to eat and consume adequate calories and nutrition, he actually gained weight, and he never asked for a soft diet); *Curtiss v. Benson*, 583 F. App'x 598, 599 (8th Cir. 2014) (unpublished per curiam) (holding that advanced registered nurse practitioners were entitled to qualified immunity on civilly-committed sex offender's claim of deliberate indifference based on their refusal to provide him with dentures; no evidence existed that the defendants knew and ignored the offender's pain resulting from his lack of teeth or that the defendants had information from which they could conclude that because the offender

had difficulty chewing certain foods without teeth he was not obtaining adequate nutrition).

But we have yet to address a deliberate-indifference claim, as in the present case, in which an inmate alleges that prison officials were deliberately indifferent to his objective medical need for dental care by failing to address a shortage of dentists in the prison, thereby subjecting the inmate to needless pain. Other courts, however, have addressed similar claims and granted qualified immunity to prison officials. For example, in *Perez-Gutierrez v. Lampert*, an inmate alleged that "he was denied timely and adequate dental treatment, which lead to the painful deterioration of his teeth and gums." No. CIV. 00-1689-HA, 2002 WL 31689536, at *7 (D. Or. Sept. 30, 2002). While the court acknowledged that "the record shows that nearly twenty months elapsed between the periodontal scaling that plaintiff received . . . and his next periodontal scaling," it concluded that "[a]ny delays in plaintiff's dental treatment during this time were attributable to an *unfortunate shortage of dentists*, rather than *deliberate delay* intended to cause plaintiff 'unnecessary and wanton infliction of pain.'" *Id.* (emphases added) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989)). As a result, the court found that the prison officials were "entitled to qualified immunity because they were not deliberately indifferent to [the inmate's] pain and dental needs, and therefore no Eighth Amendment violation occurred." *Id.*

Similarly, in *Silverbrand v. Woodford*, the prisoner claimed that "inadequate treatment or delay in treatment left the teeth compr[om]ised and left extraction as the only remaining treatment option." No. CV 06-3253-R(CW), 2010 WL 3635780, at *5 (C.D. Cal. Aug. 18, 2010), *report and recommendation adopted*, No. CV 06-3253-R(CW), 2010 WL 3635303 (C.D. Cal. Sept. 16, 2010). The prisoner "attribute[d] the loss of his teeth to two underlying problems: the *shortage of dentists* for the prison population and state policies which do not provide preventative dental care or such treatment options as gold crowns or dental implants." *Id.* (emphasis added) (citation omitted). The prisoner "recount[ed] the lengthy delays involved in

obtaining treatment, but also note[d] that [the treating dentist] explained the delays by the *shortage of available dentists*, the long list of prisoners awaiting treatment, and the state policy under which emergency treatment took precedence over scheduled treatment." *Id*. (emphasis added) (citation omitted). The prisoner did not allege that the dentist "had any control over dental staffing at [the prison] or over state policy on dental treatment of prisoners." *Id.* Relevant to the present case, the district court found that the prisoner's "allegations indicate[d] that the delays in treatment he suffered were in line with the experience of other inmates, and resulted from an *inadequate supply of dentists*, *not from deliberate indifference* on the part [of the treating dentist]." *Id.* (emphasis added). There were no allegations that the dentist possessed "the power to change [state] policy or to provide superior forms of treatment." *Id*. As a result, the court held that the prisoner failed to provide factual allegations indicating that the treating dentist "was deliberately indifferent to his serious medical needs." *Id*.

As to the supervisory defendants, the court found that the prisoner failed to offer "any factual allegations supporting a claim that these supervisory officials, acting with, at least, deliberate indifference, directly caused a violation of Plaintiff's Eighth Amendment rights." *Id*. at *6. "Insofar as Plaintiff's claims [were] predicated on the reasonable allegation that [the prison] was understaffed in regard to dentists," the court found that the prisoner failed to identify "which, if any, of his named defendants was responsible for staffing decisions (*including the necessary funding*), nor ha[d] he *offered any allegations to support a conclusion that the responsible official (if identified) acted with deliberate indifference to the rights of Plaintiff or other inmates*." *Id*. at *7 (emphases added); *see also Clay v. D'Silva*, No. 09-CV-1245, 2011 WL 1135939, at *4 (N.D.N.Y. Feb. 1, 2011), *report and recommendation adopted*, No. 9:09-CV-1245, 2011 WL 1135937 (N.D.N.Y. Mar. 25, 2011) ("[D]ocuments which [the plaintiff] attached to his complaint indicate that the dental department had an overall problem with recruitment and retention of dental staff, resulting in a state-wide shortage for the position. Moreover, the medical dental department acknowledged the long waits the inmates were experiencing, thanking them for their

patience, and explaining that treatment was occurring in order of emergent cases. This discourse illustrates that defendant was aware of the problem and was attempting to alleviate, or at least mitigate, its consequences." (citation omitted)); *Daly v. Wiley*, No. 08-CV-00411-PAB-BNB, 2010 WL 6389327, at *8 (D. Colo. Sept. 23, 2010), *report and recommendation adopted*, No. 08-CV-00411-PAB-BNB, 2011 WL 1211453, at *8 (D. Colo. Mar. 30, 2011) ("[T]he record . . . shows that the shortage of dentists at [the prison] was temporary and that recruitment efforts were underway to hire additional dental staff. Indeed, the plaintiff's own evidence contain[ed] numerous emails which demonstrate[d] that the [prison] was actively recruiting dentists from October 2006 through April 2007." (citations omitted)).

For purposes of this appeal, we will assume that Cullor suffered from an objectively serious medical need. *See Mead*, 794 F.3d at 936. But Cullor has failed to establish that Director Baldwin and Dr. Deol deliberately disregarded his need for dentures. *See id*. The undisputed facts show that the delay in providing Cullor with dentures was caused by a turnover or shortage of dentists in the prison. The undisputed facts also show that over the time that Cullor waited for dentures, the IDOC made efforts to secure additional dental staff for the ISP. Dr. Deol testified that he is constantly recruiting medical and dental professionals, but that "having to recruit physicians for ISP and dentists is a challenge." Dr. Deol and Dr. O'Brien explored various recruitment approaches, including (1) offering programs for retired dentists, (2) targeting new dentists with programs to forgive student loans in exchange for service at the prisons, and (3) offering part-time work to accommodate schedules of practicing dentists. Neither Dr. Deol nor Director Baldwin created the dental staff shortage, as the record reflects that governmental and economic factors played the greatest role in the shortage. "The practical consequence of the . . . shortage in dental staff for [the ISP], while unfortunate, was not a product of [Dr. Deol's or Director Baldwin's] conduct and cannot be characterized as deliberate indifference on [their] part." *Clay*, 2011 WL 1135939, at *4. It is undisputed that the ISP has employed five dentists since 2009 and was able successfully to recruit Dr. Johnson in 2012, who

fitted Cullor with dentures. Thus, Dr. Deol's recruitment efforts were ultimately successful.

Contrary to Cullor's argument, this is not a case in which the defendants are attempting to use costs as a reason for denying constitutionally required medical care. *See Fields v. Gander*, 734 F.2d 1313 (8th Cir. 1984) (reversing summary judgment in county jail inmate's § 1983 action against county sheriff for wrongfully denying inmate dental care because inmate's sworn statement that sheriff knew of his pain for several weeks but denied him dental care in attempt to compel payment of his earlier dental bill raised substantial fact issue as to whether sheriff's conduct violated Eighth Amendment). Cullor merely speculates that Director Baldwin and Dr. Deol were somehow responsible for *setting* the budget available to the ISP to hire dentists. *See Silverbrand*, 2010 WL 3635780, at *7 (stating that prisoner failed to identify which of the named supervisory officials was responsible for making the "necessary funding" decisions). Dr. Deol testified that the maximum salary he *could* offer a new dentist at the ISP as of November 2012 was $115,000. While Dr. Deol admitted that the salary being offered was probably a factor in his difficulty hiring dentists, he testified that he offered the maximum salary budgeted to new candidates and *sought an increase above that for dentists with special skills*. As the magistrate judge noted, "Cullor does not dispute Dr. Deol's testimony that the dentists who left ISP while Cullor was on the Denture List did so for non-monetary reasons." Nor does Cullor dispute that Dr. Deol always offered the maximum salary permitted and sought an increased salary for new dentists with special skills. In that way, Dr. Deol and Director Baldwin "neither created the . . . shortage of dentists nor the general issues with recruitment and retention." *See Clay*, 2011 WL 1135939, at *4.

As a result, we hold that Director Baldwin and Dr. Deol are entitled to qualified immunity on Cullor's deliberate-indifference claim.

-15-

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____